[No. G013438. Fourth Dist., Div. Three. Aug. 24, 1994.]

SUSAN ELIZABETH JOHNSON et al., Plaintiffs and Respondents, v.
PRATT & WHITNEY CANADA, INC., Defendant and Appellant.

**614**

**COUNSEL**

Kirkland & Ellis, Jeffrey S. Davidson and Mary A. Blodgett for Defendant and Appellant.

Greene, Broillet, Taylor & Wheeler, Browne Greene, Brian J. Panish, Esner, Marylander, Zakheim & Higa, Stuart B. Esner and Rosalyn S. Zakheim for Plaintiffs and Respondents.

**OPINION**

**SONENSHINE, J.**—Pratt & Whitney Canada, Inc. (Pratt) appeals from a $4.9 million judgment in a wrongful death action by the heirs of two United States Marine Corps pilots killed in a helicopter crash. Pratt contends the trial court abused its discretion in refusing to grant relief from discovery sanctions, which precluded it from contesting liability or proving the comparative fault of others who may have been responsible for a proportionate share of plaintiffs' noneconomic damages. Pratt also asserts plaintiffs were not entitled to damages exceeding $25,000, the amount prayed for in the

complaint, or to prejudgment interest and expert fees awarded by the court pursuant to Code of Civil Procedure section 998.[1] We affirm.

### Factual and Procedural Background

Major Kenneth Johnson and First Lieutenant Robert Riggs died as a result of injuries they sustained when their Marine Corps helicopter crashed in Cleveland National Forest on November 14, 1986. Johnson's wife and two children and Riggs's parents (collectively referred to as plaintiffs) filed a lawsuit seeking damages on their own behalf and, under Probate Code section 573, on behalf of the decedents' estates. In their first amended complaint, they alleged causes of action for negligence and strict liability against Pratt, the manufacturer of the helicopter's engines.[2] The complaint prayed for "general damages in excess of Twenty-Five Thousand Dollars [] according to proof," for funeral and burial expenses, decedents' medical and related expenses, loss of earnings, and loss of society, care, comfort and economic support. Pratt's answer generally denied the allegations of the complaint and asserted various affirmative defenses, including the contributory and comparative fault of decedents and others.

Plaintiffs' product liability claims centered around allegedly defective fuel nozzles Pratt installed in the helicopter engines. In their fourth set of production requests, plaintiffs sought documents regarding fuel nozzle specifications, problems and test results. When Pratt failed to respond in a timely manner, plaintiffs moved for an order compelling production. Before the scheduled hearing, Pratt agreed in writing to produce the documents by April 20, 1991. Consequently, plaintiffs continued the hearing, but eventually had to go forward with it because Pratt failed to keep its promise. When the matter was heard, the court imposed $1,400 in sanctions against Pratt and rebuked it: "When you cut a deal with someone, when they take a motion off calendar and then you don't comply, and then you wait until the day of the new motion or the continued motion to get to court, and then you give [plaintiffs] something which isn't verified, which isn't complete, you give the impression that you are playing a game." The court then ordered Pratt to produce the subject documents without objection within 45 days.

In the meantime, plaintiffs were required to seek court intervention regarding Pratt's failure to respond to several additional requests for documents pertaining to fuel nozzle test reports, warranties and design changes.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

[2] Plaintiffs also named Bell Helicopters Textron, Inc. (Bell), the manufacturer of the twin engine Cobra Attack helicopter. Two other manufacturers, Coltec Industries, Inc., and Delavan, Inc., were later brought into the suit as Doe defendants. Delavan, Inc. (Delavan) is the manufacturer of the fuel nozzles used in the Pratt engines. All defendants except Pratt were dismissed from the action.

Plaintiffs' counsel, explaining his unsuccessful efforts to resolve the discovery dispute informally, declared that at Pratt's request, he rescheduled a meet-and-confer session, only to have Pratt fail to show up for the appointment. Pratt's counsel then said the requested documents would be messengered, but they were not. Noting Pratt's refusal to comply with the court's earlier order, plaintiffs sought $10,000 in sanctions based on the defendant's "stonewall" tactics.

At the hearing, the court stated to Pratt's counsel, "[Y]ou seem to make all sorts of promises, but you don't seem to follow up on them." Counsel admitted there was "no excuse" for his client's failure to provide some of the documents. In response to the court's inquiry as to why Pratt had not sought a protective order, he said it was because "most of the documents . . . that plaintiffs are asking for are in one way or another relevant. It's our firm's basic view that we couldn't object to a whole lot of this stuff." Consequently, on July 9, the court issued an order compelling Pratt to produce the requested documents and to pay the sanctions earlier imposed against it, this time in the amount of $1,500. To give Pratt another chance to comply with discovery, the court reserved ruling on plaintiffs' $10,000 sanctions request until August 14.

On July 15, plaintiffs filed another motion to compel production of documents, this time in response to its 11th set of requests, which sought to discover inspection reports and photographs pertaining to the helicopter engines. They stated Pratt had also refused to comply with a subsequent production request and with the court's prior orders. In supplemental papers, they noted Pratt's recalcitrance throughout the discovery process and asked the court to impose the deferred $10,000 sanctions.

On August 14, the court ordered Pratt to produce by September 11 the documents identified in plaintiffs' requests for production, sets 11, 12 and 13. It imposed $10,000 in sanctions on Pratt and its then counsel for continued discovery abuse, and it directed the court reporter to certify the transcript of proceedings to the State Bar of California. On the basis of Pratt's representation the documents would be produced under the court's order, plaintiffs waived their claim for additional sanctions, reserving their right to renew the request if Pratt failed to comply with the order.

On September 17, at an ex parte hearing, Pratt sought an order relieving it of the burden of producing some of the documents. It advised the court the

papers were contained in 104 boxes at Pratt's Quebec facility. The court therefore ordered Pratt to make them available for plaintiffs' on-site inspection in Quebec during the week of December 9. Pratt agreed to do so. But when plaintiffs' counsel attempted to make arrangements for the inspection, Pratt claimed its Quebec plant would be closed for the holiday season and the inspection would have to be delayed until January. That would have been too late for plaintiffs; they had already scheduled January depositions and needed to review the documents in advance. Thus, they had to go to court again with an ex parte application for an order directing Pratt to honor the court-ordered arrangements.

Meanwhile, Pratt failed to respond to yet another set of requests for production seeking the "Product Support Engine Control Group Nozzle file" (control group file). Plaintiffs' motion to compel contended the control group file contained "correspondence and documentation pertaining to problems with 'short thread' fuel nozzles. . . . a defect alleged to have caused the subject engine failure." They cited Pratt's refusal to comply with discovery requests, obey court orders, or pay "a single dime of the sanctions award."

On December 12, at an ex parte hearing regarding the Quebec situation, the court ordered Pratt to fulfill its obligation regarding the 104 boxes and to arrange for plaintiffs' inspection during the week of December 16; it also ordered Pratt to refrain from impeding or impairing the inspection in any way.[3] On December 13, plaintiffs filed supplemental papers regarding the control group file, noting Pratt produced no documents from 1981 and 1982, even though many engine failures had occurred during that time. In response to Pratt's assertion that documents had been destroyed, plaintiffs asked for a court order requiring a declaration under oath from the person or persons responsible for destroying them. On December 18, the court issued that order and continued the motion to compel until January 8, 1992. It also warned Pratt's counsel: "[L]et me tell you at a particular time I'm going to issue sanctions. Once issue[] sanctions are awarded in this case, you'll wish you had it to do over." Counsel responded, "I understand that, your honor," to which the court replied, "No. Not really. Not until you've seen when issue[] sanctions land on you."

---

[3]Plaintiffs inspected the boxes in Quebec during the week of December 16. The plant was *not* closed; the documents contained in the boxes related to only one discovery request; and "[n]one of the other documents which defendant claimed were in the archives files were within the 104 boxes."

In response to the court's order, Pratt submitted declarations which were not responsive to the court's order in that they did not address the issue of destruction of the subject documents.[4] Therefore, the court advised counsel it would hold a hearing on February 26 "on my own motion as to why I should not sanction [Pratt] by striking their answer." It added, "I have been putting up with [Pratt] in this courtroom . . . for the better part of a year. They have a course of conduct of obfuscation, confusion, denial and total stonewalling. That's how it appears to a lawyer who has been a trial lawyer and a judge for thirty years."

Following the court's lead, plaintiffs moved for terminating sanctions or, in the alternative, for issue-and-evidence preclusion and monetary sanctions. Plaintiffs' papers specifically noted Pratt's discovery abuses had necessitated 15 court hearings; moreover, Pratt failed to produce documents despite 50 court-ordered requests. Plaintiffs also submitted the declaration of their counsel, who attested, "[D]uring the week of January 20[,] 1992, I traveled to Montreal, Canada to depose [Pratt] employees. During those depositions it was disclosed that many of the documents ordered produced by the court were not destroyed and in fact did exist and were readily obtainable. As a result, plaintiffs will be forced to re-depose . . . the defendant employees. Additionally, plaintiffs requested the documents again during the depositions. As of the present time none of the additional documents have been produced."

The matter was heard on March 11, 1992. The court noted trial was approaching in the more than four-year-old case; asking Pratt's counsel to explain fourteen months of stonewalling, it stated, "[I]t turns out that the same course of conduct continues even after notice of this hearing, and we're still sitting with the same stonewall. . . . It would appear that whether it's your tactics in the case or tactics ordered by your clients we are not progressing, and we continue with this impeding conduct." Numerous instances of such conduct were noted by the court, one of which involved Pratt's counsel having told the court his client did not have documents which, it turned out, the client did have. Counsel responded that he had given the court the information provided to him by his client: "If [the Pratt manager responsible for the documents] tells me we don't have them, I have to believe him." Finding lack of credibility an "ever continuing flavor" in the proceedings, it granted plaintiffs' motion "for the issue [] sanctions and

---

[4]Pratt's failure to comply was not explained until later, when plaintiffs deposed Pratt's counsel. He testified he had actually drafted an appropriate declaration, but rather than executing it, Pratt had altered it until it was no longer in compliance with the court's order.

evidentiary sanctions as requested."[5] Further, on its own motion, it struck Pratt's answer "in light of all the concerted activities to deter discovery."[6]

Pratt dismissed its counsel and substituted another law firm in its place. The successor attorney filed a motion for reconsideration under section 1008; it also moved for relief under section 473, on the basis of the former attorney's affidavit swearing his client had at all times acted in good faith and had never instructed him to evade or disobey discovery obligations; he attested the sanctions imposed on Pratt were solely the result of his own mistakes, omissions and neglect. The court denied the motions,[7] but modified its order, striking Pratt's answer except as to the issue of damages.[8] This court denied Pratt's petition for writ relief challenging the propriety of proceeding with a trial.

The court granted plaintiffs' motion for summary adjudication of Pratt's liability on each cause of action, based on its earlier issue-determination and

[5]The issue preclusion order provided, "Due to [Pratt's] persistent and wilful disobedience of this court's prior discovery orders, the court now imposes the following sanctions: [¶] Since [Pratt's] discovery abuses have precluded plaintiffs from prosecuting their case against [Pratt] the following issues are deemed determined: (a) The subject helicopter was equipped with dual orifice nozzles supplied to the United States Navy by Pratt & Whitney Canada installed in Pratt & Whitney engine number 90136, (b) a fuel nozzle in Pratt & Whitney engine number 90136 contained a manufacturing defect, (c) a fuel nozzle in Pratt & Whitney engine number 90136 failed as a result of a manufacturing defect and was a legal cause in plaintiff's damages and (d) [Pratt] was aware of the manufacturing defect called 'short threaded nozzle,' before plaintiffs' decedents' accident, yet intentionally concealed the information from the United States military." The evidence preclusion order provided: "[Pratt] is further precluded from introducing any evidence in contravention to the above delineated issues."

[6]The court's formal order provided, "For a period of no less than 16 months leading up to this order, [Pratt] has persistently and willfully refused to respond properly to discovery requests propounded by plaintiffs. This course of conduct was designed to prevent plaintiffs from preparing their case against [Pratt] for trial. During this period [Pratt] has obstructed discovery, failed to honor its stipulation with counsel for plaintiffs that it would comply with their discovery requests and has defied a number of court orders. [Pratt's] deleterious discovery conduct has necessitated at least fifteen (15) court hearings needlessly expending the resources of this court. On a number of occasions this court has imposed monetary sanctions and has warned [Pratt] of the potential for more severe sanctions, including the striking of its answer, if it persisted in flouting this court's orders. [¶] Despite these monetary sanctions and accompanying warnings, [Pratt] has continued to willfully disobey this court's orders. [Pratt's] discovery abuses are accurately chronicled in the plaintiffs' moving papers."

[7]Pratt makes no argument regarding the court's denial of the motion for reconsideration.

[8]The modification order provided in pertinent part, "The court modifies that earlier sanction order so that [Pratt's] answer is struck with respect to its liability only and not as to the question of damages sustained by plaintiffs. The issue of plaintiffs' damages is to be determined by the trier of fact and [Pratt] is entitled to offer a full defense as to that question only. This modification is made so that the sanctions imposed are even more closely tailored to the wilful discovery abuse in which [Pratt] engaged."

evidence-preclusion sanctions order.[9] A jury trial on plaintiffs' damages resulted in an award totaling $4.9 million. The court added prejudgment interest and expert fees as to the Johnson plaintiffs, whose joint section 998 offer to compromise for $1 million had been rejected by Pratt.

*Discussion*

I

We first observe Pratt does not argue the sanctions are disproportionate to the discovery abuses, and thus it concedes they are "suitable and necessary to enable the party seeking discovery to obtain the objects of the discovery he [or she] seeks." (*Caryl Richards, Inc.* v. *Superior Court* (1961) 188 Cal.App.2d 300, 304 [10 Cal.Rptr. 377].) ▮ Pratt's only contention regarding the sanctions is that the trial court should have granted relief under section 473 because their attorney presented an affidavit swearing he and he alone was responsible for the conduct that had resulted in the sanctions.[10]

In certain situations, section 473 mandates relief on the basis of an attorney's affidavit "*unless* the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect." The statute clearly involves an assessment of credibility by the trial court. Here, the court did not believe Pratt's attorney's sworn statement that the discovery fiasco was solely his fault.[11] It found: "The misconduct of which Pratt & Whitney and their counsel were, in my opinion, guilty in order to reach these really terrible decisions had to do with liability."

▮ Credibility is an issue for the fact finder. As we have repeatedly stated, we do not reweigh evidence or reassess the credibility of witnesses. (*Orange County Employees Assn.* v. *County of Orange* (1988) 205 Cal.App.3d 1289, 1293-1294 [253 Cal.Rptr. 584].) " 'We have no power to judge of the effect or value of the evidence, to weigh the evidence, to

---

[9]Other facts will be discussed as they pertain to particular legal issues.

[10]As will be seen, we do not reach the issue of whether the attorney affidavit provision of section 473 applies to discovery sanctions. Resolution of that issue is unnecessary here.

[11]Pratt protests there is no express finding that the flagrant abuse of discovery was *not* caused by the attorney. But Pratt did not request a special finding on the issue and will not be heard to complain now. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130 [275 Cal.Rptr. 797, 800 P.2d 1227].) Pratt argues it had *repeatedly*, at oral argument, requested such a finding, but the record does not support the assertion. True, in its moving and reply papers, Pratt either cited the statue to the court or, in passing discussion, pointed out the court's obligation to grant relief unless it found that the attorney was not credible. But such general argument does not constitute a request for a special finding on the issue, and Pratt *never* requested a finding.

consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' [Citations.]" (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 642 [271 Cal.Rptr. 319].) When, as here, "the evidence gives rise to conflicting reasonable inferences, one of which supports the findings of the trial court, the trial court's finding is conclusive on appeal. [Citations.]" (*Rubin* v. *Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 [205 Cal.Rptr. 455].)

■ Moreover, the finding implicating Pratt in discovery misconduct is supported by substantial evidence, as is clear from the summary set forth above. In particular, counsel stated at the sanctions hearing that his client had advised him documents did not exist, when, in fact, it appears they *did* exist. And in his deposition, counsel laid the blame for Pratt personnel's evasive and nonresponsive declarations squarely at the feet of his client. Additionally, the court reasonably could have found unsatisfactory the explanations offered by Pratt's general counsel, new counsel and others as to, for instance, why it was so difficult for them to know whether certain crucial documents were available or had been destroyed. Pratt and its counsel shared the credibility problems which the court found had added "an ever continuing flavor" to the discovery proceedings. The court did not abuse its discretion in denying Pratt relief from sanctions under section 473.

## II

■ Pratt's next contention is the trial court erred in compelling it to litigate the damages issue. This argument rests on the premise that because Pratt's answer was stricken, the court should have ordered a default prove-up hearing and limited plaintiffs' recovery to the $25,000 jurisdictional limit pleaded in the complaint.

Pratt relies on *Greenup* v. *Rodman* (1986) 42 Cal.3d 822 [231 Cal.Rptr. 220, 726 P.2d 1295] to prove its point. The case is inapt, as is obvious from even a casual reading of the decision's introductory paragraph: "As a sanction for wilful and deliberate refusal to obey discovery orders, the trial court in this case struck the answer *and entered a default judgment* in an amount exceeding the prayer of the complaint. We granted review to consider whether *a default judgment entered as a discovery sanction* is excepted from the general rule that 'if there be no answer' filed, the plaintiff's relief 'cannot exceed that . . . demanded in [the] complaint . . . .' [Citation.] We conclude that *in all default judgments the demand sets a ceiling on recovery.*" (*Id.* at p. 824, fn. omitted, italics added.)

The *Greenup* court explained why, in all cases of *default*—whether by failure to answer or by striking of the answer—there cannot be a recovery of damages greater than the demand: "[A] defendant who declines to contest an action does not thereby subject himself [or herself] to open-ended liability." (*Greenup* v. *Rodman, supra,* 42 Cal.3d 822, 826.) "[A] default judgment that exceeds the demand would effectively deny a fair hearing to the defaulting party." (*Ibid.*) The fundamental fairness guaranteed by statutory notice requirements " 'would be undermined if the door were opened to speculation, no matter how reasonable it might appear in a particular case, that a prayer for damages according to proof provided adequate notice of a defaulting defendant's potential liability.' " (*Ibid.*)

Pratt clearly *wishes* the court had entered its default and given a default judgment to plaintiffs. At the time sanctions were issued, plaintiffs had neither pleaded a specific amount of monetary damages in the complaint nor served a statement of damages under section 425.11.[12] Their complaint alleged only that their damages exceeded the court's minimal jurisdictional amount of $25,000.[13] Had a default been entered, that jurisdictional amount would have represented the upper limit of Pratt's exposure.[14] But, unlike the defendant in *Greenup,* Pratt did *not* achieve a default; it was simply deprived of the right to litigate the issue of liability. As plaintiffs note, Pratt was in no different position than any defendant who admits liability, but disputes damages; who answers the allegations concerning damages, but fails to answer the liability allegations; or who has suffered an adverse summary adjudication of the issue of liability. In none of those instances is there a

[12]Section 425.10, subdivision (b) prohibits a plaintiff in a personal injury or wrongful death action from stating in the complaint the amount of damages sought. Section 425.11 provides for subsequent service of a statement of damages informing defendant of the dollar amount plaintiff claims.

[13]Plaintiffs' prayer was as follows: "1. For general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) according to proof; [] 2. For funeral and burial expenses according to proof; [] 3. For decedent's medical and related expenses according to proof; [] 4. For loss of earnings according to proof; [] 5. [For] [t]he loss of society, care, comfort, economic support and for decedent's other economic losses according to proof, and for such other relief as the Court deems just and proper."

[14]As stated in *Greenup,* notice of damages before entry of default "enables a defendant to exercise his [or her] right to choose—at any point before trial, even after discovery has begun—between (1) giving up his [or her] right to defend in exchange for the certainty that he [or she] cannot be held liable for more than a known amount, and (2) exercising his [or her] right to defend at the costs of exposing himself [or herself] to greater liability." (*Greenup* v. *Rodman, supra,* 42 Cal.3d 822, 829.) But *Greenup* also notes with irony the harsh result that can be suffered by a *plaintiff* when the default is entered as a discovery sanction: "Civil defendants who wish to limit their liability to the minimum amount specifically pleaded can (1) force plaintiffs to undergo the frustration and expense of discovery, and then (2) absent themselves allowing a default to be entered." (*Id.* at p. 831 (conc. and dis. opn. of Bird, C. J.).)

default—or a default prove-up hearing. Here, where there was no entry of default, a default prove-up hearing would have been not only inappropriate, but unauthorized. The court could not have excluded Pratt from proceedings to determine plaintiffs' damages. It therefore correctly conducted an adversarial jury trial on the only issue remaining, i.e., the extent of plaintiffs' damages.[15]

### III

■ Pratt asserts it was erroneously deprived of an opportunity to prove the comparative fault of others who, under Civil Code section 1431.2, subdivision (a)[16] should have been obligated to pay a proportionate share of plaintiffs' noneconomic damages. According to Pratt, when the court granted plaintiffs' motion *in limine* to preclude Pratt from putting on evidence of other's wrongdoing, it "retroactively expanded its [sanctions] order." Citing *DaFonte* v. *Up-right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140], Pratt argues the fact finder assessing damages "must take into account the fault of all tort-feasors, regardless of whether they are named as defendants, immune from suit, or insolvent." It argues there are *no* exceptions to the universal rule which shields *every* defendant, no matter what the circumstances, from paying any share of noneconomic damages attributable to another's comparative fault. It relies on *Kuhns* v. *State of California* (1992) 8 Cal.App.4th 982 [10 Cal.Rptr.2d 773] for the proposition that the rule applies even when one of the defendants has suffered liability-determinative issue sanctions for its wilful discovery abuses. It contends it had an unqualified right to prove the designer and manufacturer of the fuel nozzles (Delavan), the manufacturer of the helicopter's fire warning light system (Bell), and the Marine Corps were all comparatively at fault for the accident that resulted in the deaths of Johnson and Riggs.

---

[15]Pratt also makes a casual reference to the fact that plaintiffs did not file and serve their section 425.11 statement of damages until 25 days before trial, although the statute requires service no later than 60 days before trial if there has been an answer. We note the issue was never presented in the trial court and was not addressed in the opening brief. We deem it waived. (See *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 875 [242 Cal.Rptr. 184]; *Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388]; *Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1010 [197 Cal.Rptr. 250].)

[16]Civil Code section 1431.2, subdivision (a) provides, "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

Plaintiffs justify the court's order on several grounds. First, they say, the striking of Pratt's answer as to liability eliminated Pratt's causation defenses, including its affirmative defenses regarding the comparative fault of others. This is obviously correct. The discovery sanction establishing liability precluded Pratt from contesting wrongful conduct *and* causation, e.g., Pratt's *legal responsibility* for plaintiffs' damages.[17] The inquiry into fault was ended. Pratt forfeited the right to lay the blame at someone else's feet. The question remaining for litigation was not, "Who besides Pratt harmed plaintiffs and to what extent?" Rather, it was, "What is the amount of plaintiffs' damages?"

Plaintiffs' second argument is Pratt was attempting to circumvent the sanctions by establishing the relative degree of liability of other alleged tortfeasors, which was just the flip side of proving Pratt itself was, to whatever degree, *not liable* for plaintiffs' damages. This argument also has merit. The court's modification order provided: "[Pratt's] answer is struck with respect to its liability only and not as to the question of damages sustained by plaintiffs. The issue of plaintiffs' damages is to be determined by the trier of fact and [Pratt] is entitled to offer a full defense as to that question only." By refusing to allow Pratt to show the wrongful conduct of others, the court was properly enforcing its order prohibiting Pratt from contesting its liability.

Finally, plaintiffs note the order denying Pratt's motion to present evidence of the wrongdoing of others served the interests of justice and fairness. This is true. The court found Pratt's "[obstructionist] course of conduct [was] designed to prevent plaintiffs from preparing their case . . . for trial." Pratt's stonewalling resulted in plaintiffs being "unable to fully uncover [Pratt's] level of responsibility," whether considered in isolation or vis-à-vis the acts and omissions of others. Indeed, the court stated: "Sadly, the conduct of [Pratt] has precluded the plaintiffs from competently responding to the theory of comparative fault as raised by [Pratt] at this time. As such, the liability issue sanction necessarily precluded the defendant from benefiting by its conduct over an approximate year and a half period . . . in which they did not, within the spirit of the discovery laws, respond with appropriate information so as to give knowledge for an intelligent trying of the case. That would include not only the issue of [Pratt's] liability, but also the proportion of [Pratt's] liability in light of this later-raised theory of the

---

[17]The proposition should be self-evident. There is no liability without causation, and Pratt's argument that it retained the right to contest causation, as though it could be separated from *liability*, is absurd.

fault of others."[18] Had the court allowed Pratt to point the finger of liability at others, plaintiffs would have been unprepared to defend against a shifting of responsibility and Pratt would have been rewarded "for its bad faith discovery tactics." We decline to interpret Civil Code section 1431.2 as a shield to protect litigants from the consequences of their flagrant discovery dereliction.[19] The court did not err in precluding Pratt from offering proof of the liability of others.

---

[18]Pratt takes issue with this finding, asserting there is no evidence its discovery abuses caused plaintiffs any detriment with regard to the issue of comparative fault. We disagree. The court could reasonably infer, from the *fact* of Pratt's course of conduct for more than a year of discovery, that plaintiffs had suffered prejudice to every aspect of their preparation in this complex product liability action. This is particularly true in light of the inextricably linked issues involving the performance of the helicopter engines, the design of the fuel nozzles, the knowledge or lack of knowledge of defects or failures by those responsible for installation, testing, maintenance, repairs, record keeping and other tasks relating to the subject aircraft. The adverse effects of Pratt's intransigence cannot be conveniently isolated to apply only to issues involving Pratt.

[19]Pratt's reliance on *DaFonte, supra,* and *Kuhns, supra,* to extricate it from the devastating results of its discovery abuses, is misplaced. *DaFonte* states: "[Civil Code] section 1431.2 plainly limits a defendant's share of noneconomic damages to his or her own proportionate share of comparative fault." (*DaFonte* v. *Up-right, Inc., supra,* 2 Cal.4th 593, 604.) True, as Pratt points out, *DaFonte* also says, "[Section 1431.2] plainly attacks the issue of joint liability for noneconomic tort damages root and branch. In every case, it limits the joint liability of every 'defendant' to economic damages, and it shields every 'defendant' from any share of noneconomic damages beyond that attributable to his or her own comparative fault. The statute contains no hint that a 'defendant' escapes joint liability only for noneconomic damages attributable to fellow 'defendants' while remaining jointly liable for noneconomic damage caused by others." (*Id.* at p. 602, fn. omitted.) But *DaFonte* does *not* say the court's power to issue sanctions is in any way curtailed by Civil Code section 1431.2; and it does *not* say a defendant can never forfeit its rights under the statute. In short, *DaFonte* does not address Pratt's problem.

Moreover, *Kuhns* v. *State of California, supra,* 8 Cal.App.4th 982, contains nothing supporting Pratt's argument that apportionment of noneconomic damages is mandated even where discovery sanctions prevent the defendant from contesting liability. Indeed, *Kuhns* helps plaintiffs because it shows an issue sanction can implicitly preclude a defendant from presenting an otherwise perfectly legitimate defense that is inextricably intertwined with the issue which the defendant is prohibited from contesting. "The trial judge precluded [the statutory immunity] defense on the ground that steps to warn against the dangerous condition were necessarily intertwined with the circumstances establishing the dangerous condition and were therefore precluded by the discovery sanction. . . . [¶] The trial court reasonably held [the government's] proposed [statutory] defense . . . was so interwoven with the issues in the discovery sanction as to be precluded. . . . [The government's] failure to comply with discovery interfered with [plaintiffs'] ability to show how long appellant had known about the dangerous condition. It also interfered with [plaintiffs'] ability to show the gravity of danger; the refused discovery involved both the safe speed for the curve and the physical features of the bridge abutment; greater warning steps might be required for that combination of dangers than for either danger alone. [¶] . . . In reliance upon the discovery sanction, [plaintiffs] did not explore [the] issue with [the government's] expert witness in deposition or at trial, and thus [plaintiffs] would have been prejudiced by [the government's] presentation of a reasonableness defense at trial." (*Kuhns* v. *State of California, supra,* 8 Cal.App.4th 982, 990-991.)

IV

▇▇ Pratt challenges the court's award of prejudgment interest and expert fees to Major Johnson's widow and children who made a joint section 998 offer in the amount of $1 million. Pratt refused the offer. The jury awarded $2.1 million in economic damages to all the Johnson heirs and $1.3 million in noneconomic damages to Mrs. Johnson. On the basis of Pratt's rejection of the offer, the court ordered prejudgment interest on the total award and $58,181 in costs, including plaintiffs' experts' fees. Pratt contends the court's order was in error because section 998 offers are invalid if jointly made.

Section 998, subdivision (d) provides, "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment, the court in its discretion may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses . . . actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the plaintiff, in addition to plaintiff's costs." Civil Code section 3291 provides: "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment and interest shall accrue until the satisfaction of the judgment."

It is said joint offers "deprive [a] defendant of the opportunity to evaluate the likelihood of each party receiving a more favorable verdict at trial." (*Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 410 [254 Cal.Rptr. 840].) One court has observed, "Without an apportionment of the damages among [multiple plaintiffs], it is impossible to say that any one of them received a judgment more favorable than [each] would have received under the offer." (*Gilman* v. *Beverly California Corp.* (1991) 231 Cal.App.3d 121, 126 [283 Cal.Rptr. 17.) Pratt says it could not evaluate the joint offer with respect to each plaintiff at the time the offer was made and it is now impossible to tell what portion of the combined verdict the jury assigned to each plaintiff. Thus, Pratt asserts, it cannot be determined if the award was more favorable than the terms of the offer; and the court should have denied plaintiffs' motion for prejudgment interest and expert fees.

Pratt's proposition that joint offers are invalid needs to be qualified with a "maybe." As stated in *Stallman* v. *Bell* (1991) 235 Cal.App.3d 740, 746 [286

Cal.Rptr. 755]: "[R]ecent cases have declined to mechanically apply a rule that renders void any joint offers without first examining whether it can be determined that the party claiming costs has in fact obtained a more favorable judgment." There, a joint offer was made by decedent's heir and his estate in the amount of $225,000. The jury made a unitary award to both plaintiffs in the amount of $224,500. The court held costs should be added to that amount to determine whether it exceeded the offer. (*Id.* at p. 750.) As to the problem with ascertaining whether either plaintiff received more than the section 998 offer, the court noted: "In the case before us, Ann Stallman and the Estate of Frank Stallman made a joint offer to respondents in the amount of $225,000 without designating what amount of the offer was applicable to each. After trial, the jury made a unitary award of damages to both appellants in the amount of $224,500. This circumstance differs from [other cases] in which the individual plaintiffs received separate verdicts. Here, there is but a single verdict to be compared to a single offer, and from this comparison it can be clearly determined whether or not the appellants received a more favorable judgment." (*Stallman* v. *Bell, supra*, 235 Cal.App.3d 740, 747.)[20]

The court in *Gilman* v. *Beverly California Corp., supra*, 231 Cal.App.3d 121 reached the opposite conclusion. Reversing an award of prejudgment interest and expert fees, it decided the joint offer of four wrongful death plaintiffs was invalid. The plaintiffs' section 998 offer was in the amount of $150,000. The total judgment in their favor was more than $228,000. The court rejected plaintiffs' argument that because a wrongful death action is characterized as joint, single and indivisible, they had suffered a single, indivisible injury. It noted that " '[a]lthough recovery under section 377 is in the form of a "lump sum," the amount is determined in accordance with the various heirs' separate interest in the deceased's life and the loss suffered by each by reason of the death, . . .' and therefore 'each heir should be regarded as having a personal and separate cause of action.' [Citation.]" (*Id.* at p. 126.) Accordingly, it decided: "[T]he joint offer to compromise did not afford [defendant] the opportunity to evaluate the separate and distinct loss suffered by each plaintiff as a result of the death of [decedent]. Without an apportionment of the damages among the four plaintiffs, it is impossible to

[20]The *Stallman* court also observed: "[A]ny damages awarded to the Estate of Frank Stallman would ultimately pass to Ann Stallman who is the sole intestate heir of Frank Stallman." (*Stallman* v. *Bell, supra*, 235 Cal.App.3d 740, 747.) This comment is of little relevance and certainly not a ground for distinguishing the result. The estate and the heir are, without question, separate and distinct plaintiffs, and the point is not whether one of them finally ends up with all of the award, but whether the joint offer and the single award can be compared to ascertain whether trial has yielded a result more favorable to the plaintiffs than would have been the case had the section 998 offer been accepted.

say that any one of them received a judgment more favorable than she would have received under the offer." (*Ibid.*)

The results reached in *Stallman* and *Gilman* cannot be reconciled. We find *Stallman* the better reasoned. Where a single joint cause of action is given to all heirs, who must bring *one* action (see *Mayerhoff* v. *Kaiser Foundation Health Plan, Inc.* (1977) 71 Cal.App.3d 803, 807 [138 Cal.Rptr. 319], and where the judgment must be for a single lump sum even though the heirs share the damages in proportion to their loss (see *Estate of D'India* (1976) 63 Cal.App.3d 942, 947 [134 Cal.Rptr. 165]), there would appear to be little, if any, justification for invalidating a joint offer. As aptly stated in *Stallman*, it is easy to compare a unitary verdict in favor of all heirs to the joint offer of all heirs to determine whether plaintiffs have achieved a more favorable judgment. (*Stallman* v. *Bell, supra*, 235 Cal.App.3d 740, 747.) Common sense endorses this proposition. Here, Pratt was offered the opportunity to have judgment taken against it by Major Johnson's widow and children jointly in the amount of $1 million. It rejected the offer and suffered an adverse verdict of $2.1 million in favor of all three heirs and an additional $1.3 million in favor of Mrs. Johnson. Compelling logic leads to the conclusion that these plaintiffs recovered more than the amount of their section 998 offer. The strained argument reaching a contrary conclusion "is an argument that only a lawyer could love; it rests on semantics rather than on reason." (*Gallo* v. *Superior Court* (1988) 200 Cal.App.3d 1375, 1380 [246 Cal.Rptr. 587].) The court properly determined that these plaintiffs were entitled to recover prejudgment interest under Civil Code section 3291 and expert fees under Code of Civil Procedure section 998.

The judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Wallin, Acting P. J., concurred. Crosby, J., concurred in the result.

A petition for a rehearing was denied September 21, 1994, and appellant's petition for review by the Supreme Court was denied November 17, 1994.