Filed 10/21/21  Hillman v. Pagan CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN HILLMAN et al., as Trustees, etc., Respondents and Appellants,<br><br>v.<br><br>CELESTE PAGAN,<br><br>        Petitioner and Respondent. | A160203<br><br>(San Mateo County Super. Ct. No. 19PRO00851) |

Respondents John and George Hillman are brothers who were beneficiaries and co-trustees of their mother's trust after her death.  They appeal from a judgment issued after the probate court found that a Distribution Agreement, Stipulation and Mutual Release (the distribution agreement) entered into by respondents and the other co-trustees was binding and voluntary under Probate Code[1] section 16004.5, subdivision (b)(2) (hereafter section 16004.5(b)(2)).  Respondents argue that the distribution agreement was invalid under section 16004.5, subdivision (a) (hereafter section 16004.5(a)) because they were required, as beneficiaries, to release the trustees from liability as a condition

---

[1] All statutory references are to the Probate Code unless otherwise noted.

1

to receiving distributions that were required under the trust. We will affirm the judgment.

## BACKGROUND

Respondents' mother, Frances L. Hillman[2], created the Frances L. Hillman Trust (the trust) in 1995 and last restated it in 2016. From the trust's 2016 restatement to Frances's death on April 2, 2017[3], Frances, Celeste Pagan, and Sally Severson served as the trust's co-trustees. Celeste Pagan is a former girlfriend of John Hillman, and the two share a daughter. Sally Severson is respondents' cousin. When Frances died, respondents became co-trustees of the trust along with Pagan and Severson. Under the trust terms, upon Frances's death, two $10,000 distributions were to go to Frances's stepdaughters, and respondents were to split the trust residue.

Frances lived in an assisted living center before she died, and the sale of her residence closed shortly before her death in March 2017. Sale proceeds of approximately $831,000 became a trust asset. While Frances was in the hospital in the days leading up to her death, Pagan wrote checks totaling approximately $270,000 from the trust to Frances's relatives and acquaintances, including Pagan and Pagan's husband and daughters.

---

[2] Because respondents and the decedent share a last name, we will refer to them individually by their first names.

[3] In the end of March 2017, at the age of 91, Frances choked on food while out to dinner, emergency responders broke her sternum attempting to revive her, and she was taken to the hospital. She then passed away after being transferred to another hospital for a procedure to address a blood clot.

2

The parties executed the distribution agreement in late June and early July 2017. In February 2019, respondents brought a civil suit against Pagan for breach of fiduciary duty, fraud, conversion, and negligence, alleging that Pagan raided and liquidated trust assets, engaged in self-dealing and negligence with the sale of Frances's home, and failed to provide an accurate trust accounting. In July 2019, Pagan brought the petition at issue in this appeal, seeking to confirm that the distribution agreement was valid and binding. The court held two evidentiary hearings on Pagan's petition.

## I. Walter Shjeflo

Attorney Walter Shjeflo testified that Pagan contacted him after Frances's death and sought assistance in administering the trust, and he agreed to represent her. Shjeflo first worked on the distribution of Frances's personal property to respondents, who were anxious to get the property. On or around May 17, 2017, the four trustees entered into an agreement allowing respondents to split Frances's personal property on their own without further trustee supervision. On May 16, 2017, Shjeflo's office served on the trust beneficiaries and Frances's heirs, including respondents, a notice of Frances's passing and of the deadline to contest the trust pursuant to section 16061.7[4].

---

[4] As is relevant here, section 16061.7 provides that a trustee shall notify the beneficiaries of the trust and the heirs of the settlor when a revocable trust becomes irrevocable because of the death of the settlor. "The notification by trustee shall contain the following information: [¶] (1) The identity of the settlor . . . and the date of execution of the trust instrument. [¶] (2) The name, mailing address and telephone number of each

3

Respondents were not represented by counsel.  Shjeflo testified that he discussed with respondents the concept of seeking advice from others for both the personal property and distribution agreements.

From late May 2017 to early June 2017, Shjeflo sent trust financial records to respondents, including copies of the checks written in the days before Frances's death and an escrow closing statement from the sale of Frances's house.  On May 30, 2017, Shjeflo received an email from George Hillman's wife confirming receipt of the trust financial documents Shjeflo had emailed earlier that day and requesting the names of the persons who received the checks; Shjeflo emailed copies of the checks to respondents the next day.  Shjeflo remembered speaking to respondents approximately half a dozen times.  He remembered that respondents asked questions about the checks and the sale of Frances's house, but he testified that respondents did not voice

trustee of the trust. [¶] (3) The address of the physical location where the principal place of administration of the trust is located . . . . [¶] (4) Any additional information that may be expressly required by the terms of the trust instrument. [¶] (5) A notification that the recipient is entitled, upon reasonable request to the trustee, to receive from the trustee a true and complete copy of the terms of the trust."  (§ 16061.7, subd. (g).)  The notification must also "include a warning, set out in a separate paragraph in not less than 10–point boldface type, or a reasonable equivalent thereof, that states as follows: [¶] 'You may not bring an action to contest the trust more than 120 days from the date this notification by the trustee is served upon you or 60 days from the date on which a copy of the terms of the trust is mailed or personally delivered to you during that 120–day period, whichever is later.' "  (§ 16061.7, subd. (h).)

any objections during the process. When asked whether it "played out" that respondents had to sign the distribution agreement to get their distribution, Shjeflo responded, "No." He testified, "I told them there were alternatives. They could have said, no, I don't like X, Y or Z; propose something, another compromise of some sort. They could have asked for an accounting in court, and the trustees would have had to—them included—figure[ ] out how much money they needed to reserve for those activities, whatever they turned out to be. And the remainder would have been distributed to [respondents]."

Shjeflo emailed an unexecuted version of the distribution agreement to respondents and the other trustees on June 30, 2017, and all parties returned their signatures on the agreement to Shjeflo by July 3, 2017. Respondents came to Shjeflo's office to pick up final hard copies of the agreement and its attachments on Monday, July 3, 2017, and distribution checks were sent to respondents on July 5, 2017.

## II.   George Hillman

George testified that he received a number of trust financial documents from Shjeflo's office before he signed the distribution agreement, including the escrow closing statement for the sale of Frances's home. He also said that he went to Shjeflo's office and examined documents in person on several occasions throughout the process. He was sure that he read the full distribution agreement before he signed it, including the part that stated he could go to court for an accounting. He testified that one of the reasons he did not go to court was cost—

specifically, he believed the cost would have resulted in him receiving a smaller distribution—and he wished to receive a distribution as quickly as possible.

George testified that he signed the distribution agreement to get his inheritance. He also testified that Shjeflo said to him, " 'If you want your inheritance, you have to sign this now,' or sometime in the future there's a possibility of getting it, but [Shjeflo] didn't say when or how long it would take or—and in order for us to get paid, we had to sign." George also testified that Pagan told him, "If you don't get this now, there's no telling how much will be left next time."

On cross-examination, George conceded that he tried to read everything that Shjeflo sent him, and he again confirmed that he read the distribution agreement before signing it and that Shjeflo told him he could have a court accounting but that would cost more money. George again confirmed that he signed the distribution agreement because further proceedings would diminish the trust funds, and he wanted to get the money as quickly as possible.

### III.   John Hillman

Although John testified that he may not have read the trust financial documents that Shjeflo emailed to him on May 30, 2017, he confirmed that Shjeflo's email sending these documents, including trust bank statements and a closing statement for the sale of Frances's residence, went to his email address. John further confirmed that, on May 31, 2017, Shjeflo's office emailed him copies of the checks written in the days before Frances's

death. John testified that he did not know whether his mother had instructed Pagan to write the gift checks, and conceded it was possible that she had. He testified that he signed the distribution agreement because he understood he had to sign it to get his money, and he skimmed, but did not fully read, the distribution agreement before signing it. John also testified that Pagan said to respondents, "If you don't get this now, there's no telling how much will be left next time."

## IV. Celeste Pagan

Pagan briefly testified that Frances was lucid and made all the decisions about her medical care in the days leading up to her death, John appeared happy about the checks and the help that Pagan gave Frances when Pagan spoke to him the day Frances died, and respondents were not with Frances very often. Pagan testified that she never spoke to respondents about what would happen to the trust money if they did not sign the distribution agreement.

## V. The Distribution Agreement

The distribution agreement identifies the co-trustees and named beneficiaries of the trust, the value of the trust assets as of Frances's death, and the amount available for distribution "now" after accounting for the then-current trustee's fees, taxes, and legal expenses. Pursuant to the distribution agreement, the parties approved of the accounting provided therein and the documentation that had been provided; they waived further rights to an accounting; they approved of the conduct and administration of the trustees before and after Frances's death;

7

and they fully released the trustees and their advisors as to all conduct through the date of the agreement. The parties further acknowledged that they had been advised of the right to seek counsel, and they had exercised that right to the extent they desired to do so. The parties also agreed that the agreement reflected "compromises as to the treatment and characterization of some matters" and that all parties entered into the agreement "voluntarily and without coercion as they wish to finish and end this matter without a formal or Court accounting or other proceedings despite their right to have such proceedings."

## VI. The Statement of Decision

After the evidentiary hearings, the trial court issued a statement of decision. The court framed the issue before it as whether section 16004.5(a) or section 16004.5(b)(2) applied. It noted that respondents argued that the matter turned on the dates of the distribution checks and the distribution agreement; the disputed issue of whether Shjeflo and Pagan made certain statements suggesting that a release was a condition of distribution; and, if the statements were made, the disputed issue of whether it could be construed from such evidence that Pagan required a release as a condition of a mandated distribution. The trial court then made a number of findings based on "the totality of the evidence."

First, the court found, "The statements attributed to Mr. Shjeflo, and the statement attributed to Ms. Pagan are ambiguous at most. Any reference to the fact that the remaining funds in the trust might not be there later, if made at all, do[es]

8

not condition distribution on signing the comprehensive release but only reflect what was obvious; that further trust proceedings will result in more expense. Even if made, nothing in any of the statements attributed to Shjeflo or Pagan can be characterized a requirement of distribution." The court also found that "[n]othing in the [distribution agreement] itself conditions receipt of funds on its approval."

The court continued, "George Hillman[5] testified that upon signing the release and obtaining the resulting check, he intended to use the money he obtained from the voluntary release and discharge to sue the trust. There is no evidence that [respondents] were coerced or forced into signing the [distribution agreement], or didn't understand its terms. [Respondents] had an opportunity to review the terms and seek legal advice if they chose to do so. Both waived that right. Both had the right to review supporting documents, and to varying degrees, both took advantage of that right. Further, although each testified in substance that their review of the [distribution agreement] was rather casual, each seemed to be aware of its importance." Finally, the court found that respondents knew about the trust checks written in the days before Frances's death when they signed the distribution agreement, and, while respondents had no legal training, "they were advised of the opportunity to obtain independent representation before signing the document and explicitly waived that right."

---

[5] The parties agree that the trial court meant "John Hillman."

9

The court concluded that the distribution agreement "is binding and that further, such agreements are specifically contemplated and permitted by the provisions of [ ] section 16004.5(b). Subdivision (a) is inapplicable on these facts." It also found *Bellows v. Bellows* (2011) 196 Cal.App.4th 505 (*Bellows*), to be factually distinguishable. The trial court entered a judgment finding that the distribution agreement is binding, and respondents timely appealed.

## DISCUSSION

### I. Governing Law

Section 16004.5 governs this appeal. It begins, "A trustee may not require a beneficiary to relieve the trustee of liability as a condition for making a distribution or payment to, or for the benefit of, the beneficiary, if the distribution or payment is required by the trust instrument." (§ 16004.5, subd. (a).) The statute continues, "This section may not be construed as affecting the trustee's right to: [¶] (1) [m]aintain a reserve for reasonably anticipated expenses, including, but not limited to, taxes, debts, trustee and accounting fees, and costs and expenses of administration. [¶] (2) *[s]eek a voluntary release or discharge of a trustee's liability from the beneficiary.* [¶] (3) [r]equire indemnification against a claim by a person or entity, other than a beneficiary referred to in subdivision (a), which may reasonably arise as a result of the distribution. [¶] (4) [w]ithhold any portion of an otherwise required distribution that is reasonably in dispute. [¶] (5) [s]eek court or beneficiary approval of an

10

accounting of trust activities."  (§ 16004.5, subd. (b), italics added.)

## II.   Standard of Review

In their opening brief, respondents assert that a mixed standard of de novo and abuse of discretion review applies, although they decline to explain how this mix of standards should be applied.  In contrast, Pagan contends that this case involved disputed factual matters to which this court must apply the substantial evidence standard of review.  We agree with Pagan.

A de novo standard of review applies where an appellate court's task consists of interpreting a statute or applying a statute to underlying facts that are not in dispute.  (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 (*Shapiro*).)  However, to the extent that the trial court made factual findings or drew factual inferences from disputed or undisputed facts, we defer to those findings and inferences to the extent they are supported by substantial evidence.  (*Ibid.*)  "Our power in this regard 'begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' "  (*Ibid.*, italics removed.)  Additionally, credibility is an issue of fact for the trial court to resolve.  (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622–623.)

The ruling at issue turned on the trial court's factual determinations that Pagan did not require respondents to sign the distribution agreement as a condition to making a distribution mandated by the trust, and that respondents' execution of the distribution agreement was voluntary. In their reply brief, respondents argue for de novo review, claiming that it is undisputed that respondents executed the distribution agreement before obtaining their distribution checks, and respondents "were compelled" to execute the distribution agreement. But even if the dates of execution of the pertinent checks and agreement are undisputed, as the trial court observed, the matter turned on the disputed issues of whether certain statements were made, and, if made, whether it could be inferred from such evidence that Pagan required a release as a condition of a distribution mandated by the trust. Under these circumstances, we review the trial court's determinations for substantial evidence. (See *Eyford v. Nord* (2021) 62 Cal.App.5th 112, 123 [reviewing for substantial evidence the trial court's ruling on the contested issue of whether decedent suffered from a mental health disorder with symptoms of delusions that would establish testamentary incapacity under section 6100.5, subd. (a)(2)].)

### III. Analysis

The trial court found that a preponderance of the evidence established that the execution of the distribution agreement was voluntary and without coercion or force; respondents had been afforded and waived the right to seek independent counsel;

12

respondents were afforded the right to review trust financial documents before they signed the distribution agreement; and the evidence did not establish that Pagan required execution of the distribution agreement as a condition to making a mandatory trust distribution.

Respondents dispute the trial court's findings, contending that the following evidence established they were required to sign the distribution agreement to get a distribution mandated by the trust: 1) George's testimony that Shjeflo said they had to sign now if they wanted their inheritance "or sometime in the future there's a possibility of getting it," though Shjeflo did not say "when or how long it would take"; and 2) respondents' testimony that Pagan said something to the effect that respondents had better take the money because it might not be there later.[6] But respondents ignore that the trial court's findings are supported by Shjeflo's testimony denying that respondents had to sign the distribution agreement to get their distribution, and stating that he told respondents there were alternatives to the distribution agreement, including saying, "I don't like, X, Y, Z," or doing an accounting that would result in the trustees (respondents included) setting reserves and respondents getting the remainder.[7] Additionally, noting that the statements

---

[6] Respondents do not argue that the language of the distribution agreement expressly required that they sign the release before they could receive a distribution mandated by the trust.

[7] Section 16004.5, subdivision (b)(1) expressly authorizes the trustee to withhold reserves for reasonably anticipated expenses. "This section may not be construed as affecting the

13

respondents attributed to Shjeflo and Pagan were "ambiguous at most," the trial court declined to infer therefrom that Pagan required a release as a condition of distribution. As it was relayed by George, the statement attributed to Shjeflo left room for inferences, and it is not for this court to draw an inference contrary to the one drawn by the trial court. (*Shapiro*, *supra*, 96 Cal.App.4th at p. 912.) The same is true for Pagan's statement, which did not expressly state that respondents had to sign a release to get the distribution required by the trust. (*Ibid.*) We agree with the trial court's observation that Pagan's statement that the remaining funds in the trust might not be there later, "if made at all, do[es] not condition distribution on signing the comprehensive release but only reflect[s] what was obvious; that further trust proceedings will result in more expense."

Sufficient evidence also supports the trial court's finding of voluntariness. Respondents were afforded the right to seek independent counsel, to review the distribution agreement, and to review and question the trust financial documents provided before they signed the distribution agreement. The distribution

---

trustee's right to . . . [m]aintain a reserve for reasonably anticipated expenses, including, but not limited to, taxes, debts, trustee and accounting fees, and costs and expenses of administration." Respondents claim that they received a check for exactly what they would have received under the trust in any circumstance. This argument overlooks the fact that the scope of further administration and reserves had not been finally determined, and further administration likely would have required additional administrative expenditures.

14

agreement was signed during the trust contest period (§§ 16061.7, 16061.8), so the trustees were allowed to consider that timing "in exercising discretion with respect to the timing and nature of distributions of trust assets . . . ." (§ 16061.9, subd. (c).) George Hillman confirmed that he knew he could ask for "an accounting, court involvement and that sort of thing" before he signed the distribution agreement, but he signed because he wanted the money as soon as possible. Thus, substantial evidence supports the conclusions that the distribution here occurred prior to the completion of all aspects of trust administration, and that respondents voluntarily executed the distribution agreement.

Respondents argue that the fact that distribution checks were sent after the execution of the distribution agreement establishes that the distribution was conditioned on the release as a matter of law. We cannot agree. Section 16004.5 allows the trustee to seek a voluntary release at the same time it prohibits a trustee from requiring a beneficiary to sign a release as a condition to receiving a mandatory distribution. (§ 16004.5, subds. (a), (b)(2).) Where a distribution is sent after a release is executed, the trustee's conduct violates section 16004.5(a) only if it is established that the trustee conditioned the distribution on the signing of the release. The distribution check date and the release execution date cannot in every instance provide the requisite factual showing, and, here, the trial court made a sufficiently supported finding that the trustee did not require

15

respondents to sign a release as a condition to their receipt of a mandatory distribution.[8]

Like the trial court, we find *Bellows*, *supra*, 196 Cal.App.4th 505, distinguishable. In *Bellows*, Donald, a beneficiary of his mother's trust, petitioned to force his trustee brother, Frederick, to do an accounting and distribution nine months after their mother's death, and the trial court ordered Frederick to complete the final accounting and distribution within 10 days. (*Id.* at p. 508.) Frederick sent a $30,376.80 check to Donald's counsel with a final accounting, and Donald's counsel returned the check, disputing whether Frederick properly deducted $13,000 of attorney fees from the trust corpus. (*Ibid.*) Frederick then sent Donald a $37,520.48 check (including one-half of the attorney fees), with a letter advising that Donald was " 'authorized to negotiate the check when he has signed and returned the enclosed receipt of final distribution,' " which included an acknowledgment that the payment represented the final distribution. (*Ibid.*) When Donald sought to compel Frederick to comply with the court's accounting order, Frederick argued, and the trial court agreed, that Donald had cashed the check in full satisfaction of his claim for half the trust assets. (*Id.* at pp. 508–509.) The appellate court reversed, finding there to be no dispute that Frederick owed Donald "at least $30,376.80, based on Frederick's own accounting," and, under section

---

[8] Respondents' argument that Pagan did not satisfy her burden of proof by a preponderance of the evidence is meritless, given the substantial evidence supporting the trial court's ruling.

16004.5(a), the cashed check could not be an accord and satisfaction because Frederick was prohibited from conditioning a required distribution upon Donald's execution of a release. (*Id.* at pp. 510–511.) The court explained: "A release obtained as a condition of accepting payment to which the beneficiary is entitled is in no sense voluntary." (*Id.* at p. 511.) *Bellows* did not involve a court's factual finding that a trustee did not condition receipt of a mandatory distribution upon execution of a release.[9]

## DISPOSITION

The judgment is affirmed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.[*]

*Hillman et al. v. Pagan* (A160203)

---

[9] At oral argument, respondents asserted for the first time that their execution of the distribution agreement was not voluntary because Pagan failed to disclose that she lacked written authorization under the trust to write the checks totaling approximately $270,000, and because these checks were not attached to the distribution agreement when respondents signed the agreement. We do not address these untimely arguments, which, in any event, are of doubtful merit. (*People v. Cardenas* (1997) 53 Cal.App.4th 240, 248, fn. 4.)

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.