[No. A091958. First Dist., Div. One. Mar. 18, 2002.]

SHARON McKINNEY et al., Plaintiffs and Respondents, v.
CALIFORNIA PORTLAND CEMENT COMPANY, Defendant and
Appellant.

[No. A092102. First Dist., Div. One. Mar. 18, 2002.]

SHARON McKINNEY et al., Plaintiffs and Respondents, v.
AMCORD, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts V and VI.

**COUNSEL**

Berkes Crane Robinson & Seal, Karl W. Kime, Robert H. Berkes and Mark W. Lau for Defendant and Appellant California Portland Cement Company.

Adams Nye Sinunu Walker and Barbara R. Adams for Defendant and Appellant Amcord, Inc.

Brayton Purcell, Alan R. Brayton, Gilbert L. Purcell, Diane L. Abraham and Lloyd LeRoy for Plaintiffs and Respondents.

**OPINION**

**MARCHIANO, P. J.**—Appellants, manufacturers of asbestos products, appeal from an adverse judgment in this wrongful death action. They raise issues recurring in asbestos litigation regarding admissibility of the decedent's pension and Social Security income under the collateral source rule; foundational evidence for damages for lost household services; prejudgment interest in a wrongful death case; failure to allocate fault to tobacco companies; imposition of costs under Code of Civil Procedure section 998; and inadequate foundation for business records.

We decline California Portland Cement Company's (CPC) invitation to reconstruct the collateral source rule in a way that would reduce respondents' damages. In addition, we find that there was sufficient evidence of the nature of the decedent's household services, together with appropriate reference to a study of household services. It was not error to assess personal injury prejudgment interest in this wrongful death case. Tobacco companies were immune from liability at all relevant times in the case; thus, no allocation of fault was appropriate. In the unpublished portion of the opinion, we determine that the trial court did not abuse its discretion in awarding costs after appellants' failure to accept an offer to compromise and that there

was sufficient evidence of reliability to support admission of a number of business records. We therefore affirm the judgment.

BACKGROUND

Roland and Sharon McKinney were married in the early 1950's and had two children, Kevin and Melody Ann. When Roland got out of the Navy in 1955, he returned to work as a plasterer, and was exposed to asbestos-containing products during his working career. In particular, decedent used asbestos-containing gun plastic cement, manufactured by appellants. In the early 1980's, Roland first received a warning about the dangers of asbestos from the plasterer's union. By that time, he was no longer using asbestos products in plastering.

Roland retired, for reasons unrelated to asbestos exposure, and began drawing income from his union pension in 1989. At age 62, he elected to begin receiving Social Security payments.

Two days before his death, Roland and his family learned that he had lung cancer. Although Sharon McKinney believed that cigarette smoking played a role in her husband's death, she also believed that asbestos exposure contributed to his death. Roland McKinney died of lung cancer on August 18, 1996, at the age of 64.

On December 31, 1996, Sharon McKinney and her two children brought an action for damages against a number of asbestos defendants, including appellants CPC and Amcord, Inc. The complaint alleged a survivor's action and a wrongful death action.

On January 14, 1998, McKinney served an offer to compromise on the defendants pursuant to Code of Civil Procedure section 998.[1] CPC and Amcord objected to the offer on the ground that it was premature in that discovery was still at an early stage. By the time of trial, most of the defendants had settled and only CPC and Amcord remained in the action.[2]

At the trial, Dr. Barry Ben-Zion, McKinney's economist, calculated that Roland McKinney's death resulted in lost financial support in the amount of

---

[1] The amounts listed in the offer for Amcord were $19,999.50 for each category of loss of consortium and the estate of Roland McKinney. The amount of $19,999.50 was offered to settle the wrongful death claims of both children and $39,999 for Sharon McKinney's wrongful death claim. Amounts offered to CPC were $14,999.50 for each category of loss of consortium, estate of Roland McKinney, and wrongful death for each child. The wrongful death amount for Sharon McKinney was $29,999.

[2] It appears from the record that the survival action was disposed of as to all defendants prior to trial, and only the wrongful death case was tried.

$154,050. He concluded that the value of lost household services was $65,425.

On January 10, 2000, the jury returned a special verdict finding both Amcord and CPC partially responsible for McKinney's injury. The jury awarded $135,700 as lost financial support and $54,300 as the value of lost home services. In addition, it found that Roland McKinney, a smoker, was 50 percent responsible for his own injuries and that Amcord and CPC were each 17.5 percent responsible. The jury found that Amcord, but not CPC, acted with malice or oppression. Following the court's determination of offsets, judgment was entered jointly and severally against both defendants in the amount of $77,190.06 as economic damages. Noneconomic damages were assessed against CPC in the amount of $481,250, and against Amcord in the same amount.

The court filed an amended judgment on October 17, 2000, finding that McKinney's offer to compromise was valid and assessed costs and expert witness fees against appellants. The court also imposed prejudgment interest on the damages awards. Amcord and CPC appealed, and the two appeals were consolidated for purposes of briefing, oral argument and decision.

## DISCUSSION

CPC raises three issues on appeal: (1) improper denial of its motion to suppress all evidence of the decedent's pension and Social Security income; (2) absence of supporting evidence for Dr. Ben-Zion's testimony as to the value of lost household services and improper reliance on a Cornell University study; and (3) erroneous imposition of prejudgment interest pursuant to Civil Code section 3291. Amcord also presents three issues: (1) failure to allow allocation of fault to tobacco companies; (2) error in granting enhanced costs and interest pursuant to Code of Civil Procedure section 998; and (3) abuse of discretion by admission of business records absent an adequate foundation.[3]

We discuss these issues in the order presented, and conclude that reversal is not required for any of the reasons argued by appellants.

I. *The Collateral Source Rule Does Not Bar Evidence of a Plaintiff's Damages*

 CPC filed a motion in limine seeking to preclude evidence of Sharon McKinney's claim of past and future loss of the decedent's union

---

[3]CPC joins in Amcord's arguments regarding allocation of fault to tobacco companies and costs and interest imposed pursuant to Code of Civil Procedure section 998. Amcord joins in all arguments made by CPC.

pension and Social Security benefits. CPC presented the following facts in its motion: Decedent retired in 1989 for reasons unrelated to asbestos exposure; he started receiving pension benefits and Social Security benefits at that time; he died on August 18, 1996; and, Sharon McKinney testified at her deposition that after the death, she received benefits from his Plasterer's Union pension and Social Security benefits calculated on the basis of her husband's income.

Appellants argued that McKinney's expert, Dr. Ben-Zion, testified at his deposition that Sharon McKinney was not receiving any less from the pension's survivor option than she would have received if decedent were alive.[4] Arguing that Sharon McKinney suffered no actual loss of income, CPC requested an order that she be precluded from introducing evidence regarding any financial loss based on the decedent's Social Security and pension payments. It appears in the record that Mrs. McKinney was receiving only minimal benefits in her own name prior to the death.

When Dr. Ben-Zion testified at the trial, he stated that he computed "two types of economic losses sustained by the plaintiff as a result of the death of her husband." He described lost financial support as "the amount of dollars by which the plaintiff is worse off as a result of premature death of her husband. How many more dollars would she have had available for herself had her husband not died prematurely and had he continued to receive the pension and the social security." CPC argues that Ben-Zion's description demonstrates how admission of the pension and Social Security evidence was misleading.

In opposition, McKinney argued that decedent originally elected reduced pension benefits in order to obtain survivor benefits for his spouse. Sharon McKinney only began collecting the pension's survivor benefits after her husband died. Decedent had elected to receive Social Security payments at age 62, at a reduced rate. Those benefits were available by virtue of his payments into the system for many decades. Sharon McKinney received minimal Social Security benefits in her own name prior to the death. Since her husband's death, McKinney has also received Social Security widow's benefits of 70 percent of her late husband's predeath benefits.[5]

The trial court denied the motion, stating that Sharon McKinney had not received her husband's Social Security and pension benefits prior to his

[4]In fact, Ben-Zion was asked if Sharon McKinney received any less because of the *date* of Mr. McKinney's death. He responded: "[S]he is not receiving any less because of the date of Mr. McKinney's death."

[5]CPC's counsel asked the court if there could be a stipulation or short testimony, outside the presence of the jury, as to the amounts of the pension payments before and after death. The court told counsel it was a defense motion, and that CPC should do whatever was

death and that the benefits decedent received were derived from his employment and were similar to the wage he would have contributed during his life had he been working instead of retired.

CPC's claim is based on its argument that the widow's pension benefits and the Social Security survivor's insurance benefits were not "paid in connection with the injury or death at issue." It also argues that no benefit was lost because of the death since the widow afterwards received pension and Social Security payments. CPC claims that the collateral source rule only applies to pension benefits when they are paid to replace something that was lost because of the death. Contrary to appellants' claim, we find that Sharon McKinney's survivor benefits were paid as a direct result of the death. The loss sustained was the loss of Roland McKinney's contributions to the household from his income. The survivor benefits paid to Sharon McKinney were a replacement for the lost contributions from a source unrelated to appellants.

■ The collateral source rule operates to prevent a defendant from reducing a plaintiff's damages with evidence that the plaintiff received compensation from a source independent of the defendant. (*Pacific Gas & Electric Co. v. Superior Court* (1994) 28 Cal.App.4th 174, 176 [33 Cal.Rptr.2d 522].) Examples of collateral sources that may not be used to decrease a plaintiff's recovery include medical insurance, pension and disability benefits, and continued wages paid by an employer. (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 13-14 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].)

"The idea is that tortfeasors should not recover a windfall from the thrift and foresight of persons who have actually or constructively secured insurance, pension or disability benefits to provide for themselves and their families. A contrary rule, it is feared, would misallocate liability for tort-caused losses and discourage people from obtaining benefits from independent collateral sources. [Citation.]" (*Arambula v. Wells* (1999) 72 Cal.App.4th 1006, 1009 [85 Cal.Rptr.2d 584].)[6]

To this end, our Supreme Court has stated that "in a case in which a tort victim has received partial compensation from medical insurance coverage

appropriate to provide evidentiary support for its motion. There does not appear to be any further testimony or stipulation as to the details of the pension in the record on appeal.

[6]There are numerous examples of cases holding pension, sick leave and other similar employment-related payments may not be used to reduce a plaintiff's damage award. (*Lewis v. County of Contra Costa* (1955) 130 Cal.App.2d 176, 178 [278 P.2d 756] [sick leave]; *De Cruz v. Reid* (1968) 69 Cal.2d 217, 223-227 [70 Cal.Rptr. 550, 444 P.2d 342] [money received as a result of compromise and release with decedent's employer]; *Peri v. L.A. Junction Ry.* (1943) 22 Cal.2d 111, 131 [137 P.2d 441] [insurance proceeds]; *Bencich v.*

entirely independent of the tortfeasor the trial court properly followed the collateral source rule and foreclosed defendant from mitigating damages by means of the collateral payments." (*Helfend v. Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 13-14.) The compensation, to be subject to the rule, must be "from a source wholly independent of the tortfeasor . . . ." (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; *Helfend v. Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 6.)

An independent collateral source is most often obtained as a result of plaintiff's actual or constructive payment and planning. (*Helfend v. Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 10.) The purpose of the rule is not served by allowing the defendant to escape liability for a wrong merely because the decedent was wise enough to provide for his spouse after death. The ruling CPC seeks would, in effect, allow it to offset the pension and Social Security widow's benefits from the wrongful death damages, a result that violates the spirit and intent of the collateral source rule.

There are exceptions to the rule of exclusion, for example, where the defendant is allowed to introduce otherwise inadmissible evidence of the lack of assets in a decedent's estate to impeach self-serving testimony by the children as to the loss of anticipated gifts of large amounts of cash. (*Stathos v. Lemich* (1963) 213 Cal.App.2d 52, 56-57 [28 Cal.Rptr. 462].) In that case, the court refused to allow the plaintiff to hide behind the rule of exclusion and use it as "an aggressive weapon" to prevent the defendant from showing decedent's inability to make such gifts. (*Id.* at p. 57; see also *Hrnjak v. Graymar, Inc., supra,* 4 Cal.3d 725 [evidence of insurance receipts admissible to show plaintiff is malingering]; *Lafayette v. County of Los Angeles* (1984) 162 Cal.App.3d 547 [208 Cal.Rptr. 668] [value of disability payments may be shown, after Evid. Code, § 352 analysis, on issue of plaintiff's motivation to seek work].)

---

*Market St. Ry. Co.* (1938) 29 Cal.App.2d 641, 647-648 [85 P.2d 556] [no reduction of lost earning capacity by reason of employee's receipt of pension proceeds]; Rest.2d Torts, § 920A, com. c(4), pp. 514-515 [listing Social Security and pension benefits as being subject to the collateral source rule]; Annot., Collateral Source Rule: Receipt of Public or Private Pension as Affecting Recovery Against a Tortfeasor (1961) 75 A.L.R.2d 885 [cases on receipt of public or private disability or retirement pensions as collateral sources]; Johns, Cal. Damages: Law and Proof (5th ed. 2001) Collateral Source Rules, §§ 1.65-1.69, pp. 1-82 to 1-84 [listing disability income insurance, wages paid by employers, accumulated employment leave, unemployment compensation and disability retirement or pension benefits as collateral sources that do not reduce damages].)

 However, CPC is not trying to fit within an exception by producing impeaching evidence.[7] CPC seeks to apply the rule to affirmatively block the widow from producing evidence of her deceased husband's income. CPC argues that if the collateral source rule prevents it from obtaining an offset of damages in the amount of the pension, it should also apply to preclude the widow from referring to her husband's pension in her affirmative showing of lost financial contributions to the household. Although the argument has a superficial hint of fairness, we reject what is in essence an attempt to apply the collateral source rule in reverse, as it does not serve the purposes of the rule. CPC's attempted use of the collateral source rule as a weapon to diminish damages conflicts with the underlying, long-standing principle of the rule.

CPC's complaint that McKinney did not actually suffer a loss because she received postdeath benefits from the same source as her husband's earnings makes no difference in the application of the collateral source rule. Barring consideration of payments from an outside source will always result in a reduction of the loss actually suffered by a plaintiff. As noted in *Hume v. Lacey* (1952) 112 Cal.App.2d 147 [245 P.2d 672], the fact that a plaintiff may in fact receive as much, or more than he or she received prior to the injury, does not impact the collateral source rule. (*Id.* at pp. 151-152.) It is an integral part of the rule that a plaintiff will be compensated for his or her loss in some fashion from the outside source. The rule is no different because the compensation comes from a pension benefit rather than an insurance policy.

For example, the plaintiff in *Hume* received more because of his injury than he would have received if he had not been injured. This fact did not change the legal analysis and plaintiff's pension benefits were not allowed as an offset to reduce the damages for lost earning capacity. The court stated: "It may be observed that there is a valid reason for not giving the wrongdoer any benefit from pension rights, with which he had nothing to do. They were previously acquired by the injured party, were paid for by him in some manner, and the fact that he had other property in the nature of a pension right may logically be held immaterial." (*Hume v. Lacey, supra,* 112 Cal.App.2d at p. 152.)

CPC cites two out-of-state cases to support its contention that because the decedent in this case was retired and receiving a pension at the time of his

---

[7]After Kevin McKinney's testimony, CPC sought admission of evidence that Sharon McKinney received the same income after decedent's death as decedent received during his lifetime to rebut part of Kevin's testimony. The court properly analyzed the request under Evidence Code section 352 and noted that Kevin McKinney had not testified that his mother could not afford to live in her house because of a reduced income. The court recalled Kevin's testimony as stating that he lived with his mother and helped her with household chores that she would otherwise have had to pay for, and that he did not believe she could afford to do that. The court's recollection was correct, and the proposed evidence was properly rejected.

death, we should apply the collateral source rule to reduce his widow's damages. The cited cases do not reflect the law in this state. *St. Louis, I.M. & S. Ry. Co. v. Maddry* (1893) 57 Ark. 306 [21 S.W. 472] (*Maddry*) actually upheld the trial court's suppression of evidence of the widow's eligibility for a pension as a result of her husband's death. CPC finds importance in a comment to the effect that if the pension "had been granted and made payable to [decedent] for his life, and to his widow and children upon his death, it may be that the matter would not have been proper for consideration, as his death would have caused no deprivation in that respect. [Citation.] But such is not the law. Under the law the pension granted to him lapsed at his death, and did not pass by limitation to plaintiffs." (*Id.* at p. 473.)

The dictum in *Maddry* does not help CPC. Even if that case correctly stated California law, CPC failed to produce any evidence that Roland McKinney's pension and Social Security rights did not terminate at death. There is no evidence in this case that Sharon McKinney received pension payments prior to her husband's death. The only indications are that she received survivor's benefits after his death. These are new benefits, issued for the first time in her name, as a direct result of the death. They are collateral sources that may not be used to diminish CPC's financial responsibility for the death of Roland McKinney.

The other case cited by CPC, *McLemore v. Broussard* (Tex.App. 1983) 670 S.W.2d 301, was a mother's action for the wrongful death of her child in an automobile collision. Before the accident, the mother, a widow, was receiving monthly minor's and mother's Social Security payments as a consequence of her husband's death. Those payments were terminated when the child died. Citing the Texas statute, the court stated that the mother could only obtain damages for "actual damages on account of the injuries causing the death." (*Id.* at p. 303.)[8] Without discussion, the court held that because "fringe benefits" were not admissible to diminish the survivor's damages, the loss of the minor's and mother's Social Security benefits should be excluded from the calculation of damages. We are not convinced by the *McLemore* court's short discussion of the issue.

A Wisconsin court found *McLemore* to be poorly reasoned, and an improper reverse application of the collateral source rule. (*Estate of Holt v. State Farm Fire & Cas.* (1989) 151 Wis.2d 455 [444 N.W.2d 453, 455].) The *Holt* court stated: "If we were to apply the collateral source rule inversely, we would allow [defendant] to escape liability for a wrong for which it is

---

[8]Code of Civil Procedure section 377.61 provides that in a wrongful death action in California, "damages may be awarded that, under all the circumstances of the case, may be just . . . ."

responsible and we would thereby defeat the purpose of the rule." (*Id.* at p. 455.) We agree with the *Holt* court's comment.

The nature of the sources of income at issue in this case supports the conclusion that they were properly considered as damages for the wrongful death of Roland McKinney. The Social Security benefits paid to Roland McKinney during his life were based on his earnings and paid to decedent. He apparently applied a portion of those benefits to support his household. The only evidence available in the record on appeal indicates that Sharon McKinney did not directly receive her husband's Social Security payments while he was alive. As a result of his death, she became entitled to Social Security death benefits in her own name, based on her husband's earnings. The Social Security Administration itself refers to such benefits as "survivors insurance."[9] (Social Security Survivors Benefits, Publication No. 05-10084, part 1, reprinted at <http://www.ssa.gov/pubs/10084.html> [as of Mar. 18, 2002].) Social Security publications instruct survivors like Sharon McKinney to apply promptly for widow's benefits, which indicates that the benefits paid to the deceased spouse do not automatically continue in an unchanged form. (*Id.,* part 2, reprinted at <http://www.ssa.gov/pubs/10084.html> [as of Mar. 18, 2002].) This benefit did not exist before decedent's death, but is a new benefit flowing to Sharon McKinney as a direct result of the death. It is a classic collateral source, and CPC has produced no reason to ignore the rule.

The issue regarding the pension is not quite as clear, but CPC did not place any evidence in the record to indicate that the union pension was a joint payment to Sharon McKinney and her husband that merely continued unchanged after his death. Since CPC was the proponent of the motion, if this were a joint continuing payment, it was CPC's burden to produce supporting evidence.[10] McKinney's offer of proof was that, like many pensions, the plasterers union pension offered reduced lifetime benefits in exchange for death benefits to a surviving spouse. (See, e.g., *In re Marriage of Lowell* (1991) 171 Ariz. 462 [831 P.2d 838, 839] [husband's federal civil service pension provided survivor option funded by reduction in current pension payments]; *Plaster and Plaster* (1982) 55 Or.App. 700 [639 P.2d 1287, 1289] [husband's telephone company pension plan offered survivor

---

[9]A Social Security publication describes the survivor's benefit as follows: "Some of the Social Security taxes you pay go toward survivors insurance. In fact, the value of the survivors insurance you have under Social Security is probably more than the value of your individual life insurance." (Social Security Survivors Benefits, Publication No. 05-10084, part 1, reprinted at <http://www.ssa.gov/pubs/10084.html> [as of Mar. 18, 2002].)

[10]We are not inferring that the rule would be different in the case of a continuing payment. That issue is not before us.

benefit in exchange for reduced lifetime benefits]; *In re Marriage of Lion-berger* (1979) 97 Cal.App.3d 56, 67 [158 Cal.Rptr. 535] [operating engineers pension plan provided for survivor benefit in exchange for reduced lifetime income].)

This feature of a pension, which is, in essence, a constructive payment for the survivor benefit, makes it look much like an insurance policy. In *McQuillan v. Southern Pacific Co.* (1974) 40 Cal.App.3d 802 [115 Cal.Rptr. 418], this court noted that a Public Employees' Retirement System pension benefit is " 'a derivative right, an element of the deceased's compensation earned by the employee by his performance of his duties. [Citations.]' [Citations.]" (*Id.* at pp. 807-808.) The contributions to the pension plan resulted in a collateral source benefit wholly independent from the tortfeasor.

We decline to adopt CPC's proposed application of the collateral source rule to allow a defendant to decrease an injured plaintiff's recovery. The benefits paid to Roland McKinney were in the nature of a salary replacement that ended with his death and were properly considered in the calculation of lost support. The subsequent widow's benefits paid to Sharon McKinney were from sources independent of CPC, due entirely to Roland McKinney's planning and constructive payment. The trial court did not abuse its discretion in denying appellants' request to preclude the evidence of Roland McKinney's predeath income.

## II. *Substantial Evidence Supported Testimony as to Lost Household Services*

CPC brought an unsuccessful motion in the trial court seeking to exclude Dr. Ben-Zion's testimony regarding loss of household services. On appeal, CPC argues that there was no evidence to support Dr. Ben-Zion's testimony concerning loss of household services. CPC also challenges the use of a Cornell University study because it did not break down the value of each household service and used only an aggregate estimate for the value of such services. We have reviewed the record on appeal and find substantial evidence was produced regarding the household services performed by the deceased. There was no error in allowing use of the Cornell study.

Kevin McKinney testified that after his father's death, he became responsible for lawn mowing, weeding, gardening, changing light bulbs, fixing leaky faucets and doing whatever maintenance was required around the house. Without Kevin's help, his mother would have to pay someone to do those tasks.

Sharon McKinney testified that her husband maintained the family's recreational vehicle. He did all the shopping for clothes. When asked about the household services Roland McKinney provided in general, Mrs. McKinney testified: "There wasn't anything he couldn't do. Outside he built the patio cover, he poured the cement, inside he redecorated for me, he redid the kitchen and the bathroom, putting new fixtures in, he did the plumbing, he was very—a very handy man."

Appellants argue that because the services previously performed by decedent were not proven to be services that Mrs. McKinney would need and pay for after her husband's death, they do not come within the category of economic damages, but are akin to noneconomic damages such as loss of companionship and rendering help out of love for a spouse. But the record on appeal shows that decedent performed household services that had a particular economic value. Decedent performed services that saved the expense of hiring someone else. The jury was correctly instructed under BAJI No. 14.50 (1995 rev.) (8th ed. 1994) that it could consider "the costs of obtaining substitute domestic services" as economic damages. The jury then decided from the evidence whether such typical quantifiable services were needed in the future. (See Cal. Tort Damages (Cont.Ed.Bar 1988) §§ 3.23-3.24, pp. 103-104; *id.* (2001 supp.) § 3.23, pp. 39-40.)

The family's testimony provided sufficient support for a determination that the decedent performed substantial household services. It provided a sufficient factual foundation for Dr. Ben-Zion's testimony regarding the ascertainable value of particular household services that are distinguishable from generalized noneconomic damages from the loss of a dutiful, loving and helpful spouse.

During his testimony, Dr. Ben-Zion relied in part on the Cornell University study of the value of household services. CPC contends that unless the surviving spouse actually pays money to replace the lost services, the resulting loss represents only the noneconomic damages of lost companionship and comfort. Building on this point, CPC relies on *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757 [70 Cal.Rptr.2d 571] to argue that it was improper to use the Cornell study to measure damages for loss of household services.

The *Loth* case concerned expert testimony that purported to compute the element of pain and suffering by use of a mathematical formula. (*Loth v. Truck-A-Way Corp., supra,* 60 Cal.App.4th at p. 767.) The court rejected the arbitrary formula used by the expert to value plaintiff's loss of enjoyment of life as a result of a vehicle accident. The formula relied on studies of the

amount society is willing to pay for seat belts and other protective devices, the premium pay for hazardous jobs and a cost/benefit analysis of federally mandated safety projects, adjusted for life expectancy, and set a dollar figure on various percentages of lost enjoyment of life. (*Id.* at p. 762.) The court rejected the formula as having nothing to do with plaintiff's injuries. (*Id.* at p. 768.)

In this case, Dr. Ben-Zion described the Cornell University study as one that analyzed what people did around the home such as home repair and maintenance, automobile maintenance, yard work, cooking, cleaning, shopping and general home maintenance. In his analysis, Dr. Ben-Zion assumed that decedent was an average provider based on the study criteria.[11] He explained that the fact finder decides if the particular individual did more or less than average and whether he had more than average skills in determining the value of services. He explained that using the average individual to calculate the value of a retired man's home services resulted in a figure of $6,500 a year, which he characterized as low. Applying the Cornell study average, as adjusted for life expectancy and other factors, Dr. Ben-Zion computed a total of $20,975 in lost household services caused by the death of Roland McKinney.

Unlike *Loth v. Truck-A-Way Corp., supra,* 60 Cal.App.4th 757, the criteria used in the Cornell study had a direct bearing on the value of household services that are lost when the retired male head of the household dies. Using the study, Dr. Ben-Zion presented an estimated value of an average provider's services in the home. This estimate, coupled with the evidence of Roland McKinney's actual work around the house, was properly presented for the jury's consideration.

III. *Prejudgment Interest Under Civil Code Section 3291 Was Appropriate*

Over appellants' objection, the trial court granted McKinney's request for prejudgment interest based on Civil Code section 3291. On appeal, CPC again raises its contention that Civil Code section 3291 applies only to personal injury actions, and not to wrongful death cases.[12] We determine that this wrongful death action is one for personal injury, and that interest was properly assessed on the judgment.

---

[11]"Average" was described as "taking all the activities that the men did and arriving at a dollar value."

[12]Amcord joins in this argument. As CPC notes, the argument assumes that we find that the Code of Civil Procedure section 998 offer is a valid basis for the imposition of interest. As discussed in connection with Amcord's arguments, we find the offer was valid.

Civil Code section 3291 provides, in relevant part:

"In any action brought to recover damages for personal injury sustained by any person resulting from or occasioned by the tort of any other person, corporation, association, or partnership, whether by negligence or by willful intent of the other person, corporation, association, or partnership, and whether the injury was fatal or otherwise, it is lawful for the plaintiff in the complaint to claim interest on the damages alleged as provided in this section.

"If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

CPC argues that if the Legislature intended to include wrongful death cases within the definition of "personal injury" it would have specifically so stated. It points to several other statutes that use the terminology "personal injury or wrongful death" as support for its claim that to be included, wrongful death must be expressly stated. We acknowledge the possibility that CPC has uncovered a statutory design that arguably supports its theory, but we reject the theory in light of the apparent intent of the statute and the nature of the damages recoverable in a wrongful death action.

■ "For more than a century it has been settled that one purpose of . . . prejudgment interest in general, is to provide just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury. [Citations.]" (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663 [25 Cal.Rptr.2d 109, 863 P.2d 179] (*Lakin*).) Another purpose of Civil Code section 3291 is to "provide a statutory incentive to settle personal injury litigation where plaintiff has been physically as well as economically impaired, and thus it has been considered inapplicable to contractual disputes, business-tort losses and arbitration proceedings." (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 126, 130 [3 Cal.Rptr.2d 666, 822 P.2d 374] [finding that damages in action for breach of covenant of good faith and fair dealing relate primarily to loss caused by interference with a property right, so not subject to prejudgment interest].)

Passage of the bill that became Civil Code section 3291 was heralded as a "victory for trial lawyers" in that it was expected to reduce court congestion

by providing a powerful incentive for settlement of tort cases. (Pollard, *Prejudgment-Interest Bill a Victory for Trial Lawyers* (June 1982) 2 Cal. Law. No. 6, p. 27.) "The Legislature intended different treatment of personal injury actions because of the manifest greater prejudice of delay in recovering personal injury damages as compared to contractual or business-tort losses given the probability personal injury plaintiffs are likely to be physically as well as monetarily impaired." (*Morin v. ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 206, fn. 1 [240 Cal.Rptr. 509].)[13]

The background of the statute indicates a concern with differentiating broadly between property damage and personal injury. The most useful approach, therefore, when deciding if Civil Code section 3291 applies to a specific case, is not to rely on the formal label placed on the complaint, such as negligence, defamation or wrongful death. The appropriate query is whether the damages may be characterized as compensation for a personal injury. (*Lakin, supra,* 6 Cal.4th at p. 661.)

For example, *Lakin* concerned a claim of emotional distress related to defendant's unwarranted denial of the fact of an automobile accident involving defendant's employee and plaintiff. The court compared that claim to the emotional distress claim in *Gourley v. State Farm Mut. Auto. Ins. Co., supra,* 53 Cal.3d 121, 126-127, which was based on an insurer's bad faith failure to provide insurance benefits. The court determined that, unlike the situation in *Gourley,* the plaintiff's claims in *Lakin* were not based on an invasion of a property interest, but "were at the heart of her case." (*Lakin, supra,* 6 Cal.4th at pp. 656-657.) The emotional distress in *Lakin* emanated from the accident itself and the defendants' actions in giving a false name and denying that the accident occurred. The court stated that the fact that the events caused some property damage did not change the nature of the damages as being caused by a personal injury. (*Id.* at p. 657.)

" ' "An injury is personal when it impairs the well-being or the mental or physical health of the victim." ' [Citations.]" (*Bihun v. AT&T Information Systems, Inc., supra,* 13 Cal.App.4th 976, 1005 [finding workplace sexual harassment is a personal injury].) We believe the answer is clear that the damages awarded to a spouse and children as a result of the wrongful death of a husband and father are personal injury damages. (See, e.g., *Weaver v. Bahumes* (N.D.Cal. 1955) 127 F.Supp. 85, 87 [phrase "injury to the person"

---

[13]*Morin v. ABA Recovery Service, Inc., supra,* 195 Cal.App.3d 200, was disapproved in *Lakin* to the extent it concluded that prejudgment interest may be calculated on an award of punitive damages. (*Lakin, supra,* 6 Cal.4th at pp. 662-664 [also disapproving *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 [16 Cal.Rptr.2d 787], for the same reason].)

used in statute of limitations refers an action for consequential damages by a husband on account of death of wife]; and *Yates v. Pollock* (1987) 194 Cal.App.3d 195, 199 [239 Cal.Rptr. 383] [wrongful death claims included in statute referring only to actions for "injury" rather than "injury or wrongful death"].) The trial court did not err in applying Civil Code section 3291 to damages suffered because of a wrongful death.[14] We turn now to the issues raised by Amcord.

## IV. *Trial Court Correctly Refused to Allocate Liability to Tobacco Companies*[15]

■ The trial court instructed the jury not to apportion any fault to tobacco companies because those entities were statutorily immune to liability at the time of Roland McKinney's diagnosis and death. Appellants argue that the Legislature removed the statutory immunity when it amended Civil Code section 1714.45, effective January 1, 1998. Relying on language in the amended statute stating that the new law applies to "claims that were or are brought . . . ," appellants argue that because the tobacco immunity was repealed while this action was pending, the jury should have been instructed to allocate a portion of fault to tobacco companies.[16]

---

[14]We have not relied on *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613 [34 Cal.Rptr.2d 26], which affirmed an award of prejudgment interest in a wrongful death case, because the precise issue raised here was not expressly addressed in that case.

[15]Respondents objected to the timeliness of Amcord's filing of its motion for new trial, the absence of a formal statement of appealability from the appellate brief and the size of the type used in the brief. Amcord correctly noted that its new trial motion and its notice of appeal were timely filed. There is a sufficient statement of the finality of the judgment from which it appealed. While we do not condone the rule violations noted by respondents, they are not sufficiently egregious to merit striking the brief.

[16]Civil Code section 1714.45, as amended, provides:

"(a) In a product liability action, a manufacturer or seller shall not be liable if both of the following apply:

"(1) The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community.

"(2) The product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, and butter, as identified in comment i to Section 402A of the Restatement (Second) of Torts.

"(b) This section does not exempt the manufacture or sale of tobacco products by tobacco manufacturers and their successors in interest from product liability actions, but does exempt the sale or distribution of tobacco products by any other person, including, but not limited to, retailers or distributors.

"(c) For purposes of this section, the term 'product liability action' means any action for injury or death caused by a product, except that the term does not include an action based on a manufacturing defect or breach of an express warranty.

"(d) This section is intended to be declarative of and does not alter or amend existing California law, including Cronin v. J.B.E. Olson Corp., (1972), 8 Cal.3d 121 [104 Cal.Rptr.

Appellants urge this court to apply the amended statute to a case in which no claim was brought against a tobacco company, either before or after the amendment became effective. The Supreme Court is considering several cases involving the applicability of the amendment to Civil Code section 1714.45 to cases arising before its enactment.[17] The statute has presented interpretive problems since its original enactment in 1987. It has been described as "poorly drafted" and internally inconsistent and the product of a hasty compromise between competing interests known as the " 'napkin deal.' " (*American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480, 485, 487-488 [255 Cal.Rptr. 280]; see Assem. Com. on Judiciary, Rep. on Sen. Bill No. 67 (1997-1998 Reg. Sess.) as amended Apr. 16, 1997, p. 1; Moy, *Tobacco Companies, Immune No More—California's Removal of the Legal Barriers Preventing Plaintiffs from Recovering for Tobacco-Related Illness* (1998) 29 McGeorge L.Rev. 761, 770.)

Parts of the original statute remain after the amendment, perpetuating the inaccuracy and inconsistency in the legislative language. Despite a comment in a senate committee analysis that concern had been expressed that the amendment would have only prospective application without specific

---

433, 501 P.2d 1153], and shall apply to all product liability actions pending on, or commenced after, January 1, 1988.

"(e) This section does not apply to, and never applied to, an action brought by a public entity to recover the value of benefits provided to individuals injured by a tobacco-related illness caused by the tortious conduct of a tobacco company or its successor in interest, including, but not limited to, an action brought pursuant to Section 14124.71 of the Welfare and Institutions Code. In the action brought by a public entity, the fact that the injured individual's claim against the defendant may be barred by a prior version of this section shall not be a defense. This subdivision does not constitute a change in, but is declaratory of, existing law relating to tobacco products.

"(f) It is the intention of the Legislature in enacting the amendments to subdivisions (a) and (b) of this section adopted at the 1997-98 Regular Session to declare that there exists no statutory bar to tobacco-related personal injury, wrongful death, or other tort claims against tobacco manufacturers and their successors in interest by California smokers or others who have suffered or incurred injuries, damages, or costs arising from the promotion, marketing, sale, or consumption of tobacco products. It is also the intention of the Legislature to clarify that those claims that were or are brought shall be determined on their merits, without the imposition of any claim of statutory bar or categorical defense.

"(g) This section shall not be construed to grant immunity to a tobacco industry research organization."

[17]This issue is currently pending before the Supreme Court in *Henley v. Philip Morris, Inc.* (2001) 93 Cal.App.4th 824 [113 Cal.Rptr.2d 494], review granted January 29, 2002, S102941; *Naegele v. R.J. Reynolds Tobacco Co.* (2000) 81 Cal.App.4th 503 [96 Cal.Rptr.2d 666], review granted October 18, 2000, S090420; *Souders v. Philip Morris Inc.* (2001) 87 Cal.App.4th 756 [104 Cal.Rptr.2d 666], review granted May 16, 2001, S096570; *Myers v. Phillip Morris Companies, Inc.* (9th Cir. 2001) 239 F.3d 1029 (certifying retroactivity issue to Cal. Supreme Ct.*).

*Reporter's Note: For Supreme Court opinion, see 28 Cal.4th 828.

language specifying retroactive application, no specific language was added.(Sen. Com. on Judiciary, Analysis of Sen. Bill No. 67 (1997-1998 Reg. Sess.) as amended Feb. 14, 1997, for hearing date of Apr. 8, 1997, p. 3.) Instead, the Legislature added subdivision (f), which contains the language regarding claims that "were or are brought." The difficulty in interpreting the language of this statute brings to mind former Justice Newsom's comment that the legislation "illustrates poignantly the maxim so useful in statutory construction—that if the Legislature had known what it meant, it would have said so." (*Bunton v. Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210, 223 [190 Cal.Rptr. 295] (conc. opn. of Newsom, J.).) While we do not necessarily presume legislative uncertainty as to intent, the expression of that intent could have been stated in a more affirmative manner.

However, we need not directly address the issue of whether the statute applies retroactively to causes that arose prior to enactment of the amendment, for there is no hint in the legislative verbiage that the amendment was intended to revive an already barred claim for purposes of applying Proposition 51 to allocate noneconomic damages to a statutorily immune nonparty to the action.

In this case, the claim accrued when Roland McKinney was diagnosed with cancer, two days before he died in 1996.[18] (*Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 540 [66 Cal.Rptr.2d 438, 941 P.2d 71] [cause of action for latent progressive disease accrues when diagnosed or when plaintiff otherwise discovers disease].) No claim was ever filed against a tobacco company in this case. The reason for that circumstance is probably that the statute of limitations on the wrongful death claim expired in August of 1997, before the amendment to Civil Code section 1714.45 took effect.

We need look no farther than *Barker v. Brown & Williamson Tobacco Corp.* (2001) 88 Cal.App.4th 42 [105 Cal.Rptr.2d 531] for the proper result in this case. In *Barker*, the plaintiff brought a wrongful death action against a tobacco company, based on his father's death in 1962 from a tobacco-related illness. The *Barker* court held that the Legislature intended only to eliminate the tobacco immunity. Nothing in the legislative history or in the language of the amendments indicates an intent to revive claims that are time-barred. (*Id.* at p. 49.) Because the claim in this case was barred before the tobacco immunity was repealed, it would be unfair and contrary to the legislative intendment to allocate fault to an absent defendant that was

---

[18]Code of Civil Procedure section 340, subdivision (3) provides a limitation period of one year for a wrongful death action.

statutorily immune during the time the plaintiff could have filed an action against that defendant.[19]

Appellants contend that the statute of limitations need not be implicated in this case. Appellants argue that the Legislature passed the bill amending Civil Code section 1714.45 prior to August of 1997, so McKinney could have amended the complaint before the statute of limitations expired on August 17, 1997, and delayed service on the tobacco defendants until the amendment to section 1714.45 took effect on January 1, 1998.[20] We are aware of no authority requiring such prescience on the part of plaintiffs. During the entire time that the limitations period was running on the wrongful death claim, tobacco companies were completely immune from liability. Whether or not the scenario proposed by appellants would have overcome that immunity for purposes of allocating fault to an absent defendant is not an issue that is raised by the facts of this case.

We also reject the argument that the opinion in *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140] supports the notion that a share of noneconomic damages may be assessed against tobacco companies, despite expiration of the statute of limitations on a particular claim. The Supreme Court itself has explained that unlike the employer in *DaFonte*, tobacco suppliers that are protected by the Civil Code section 1714.45 immunity breach no duty and commit no tort for which liability may rightfully be apportioned. (*Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 989, 998-1001 [60 Cal.Rptr.2d 103, 928 P.2d 1181].)[21] The trial court did not err in refusing to allocate a percentage of noneconomic damages to nonparty tobacco companies where the claim was barred by the statute of limitations prior to the effective date of the amendments to section 1714.45.

V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

[19]It seems likely that a portion of the fault allocable to tobacco was assessed against decedent himself. Although counsel argued to the jury that it should not place all of the blame for a tobacco-caused illness on decedent, the jury found that Roland McKinney was 50 percent responsible for his injuries.

[20]The legislative history indicates that Senate Bill No. 67 (1997-1998 Reg. Sess.) was not approved by the Governor until September 29, 1997. (Stats. 1997, ch. 570, § 1, amending Civ. Code, § 1714.45.)

[21]At oral argument, counsel contended that even if an entity is immune from liability, a defendant should be able to allocate fault against that entity. We do not follow the logic of this argument, in light of the Supreme Court's explanation in *Richards v. Owens-Illinois, Inc., supra,* 14 Cal.4th 985, 989, 998-1001, that an immune entity commits no tort and therefore cannot be at fault.

*See footnote, *ante*, page 1214.

## CONCLUSION

The judgment is affirmed.

Stein, J., and Swager, J., concurred.

The petition of appellant Amcord, Inc., for review by the Supreme Court was denied June 12, 2002.