Filed 3/17/14  Yacoub v. Talia CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH YACOUB,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>WILLIAM J. TALIA,<br><br>      Defendant and Respondent. | D063321<br><br><br>(Super. Ct. No.<br>  37-2011-0098208-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed.

Zampi, Determan & Erickson, Joseph P. Zampi and Garrett A. Smee for Plaintiff and Appellant.

Murchison & Cumming, Robert M. Scherk and Scott J. Loeding for Defendant and Respondent.

Plaintiff Joseph Yacoub appeals a judgment entered after a jury found in his favor on his personal injury claim, but assigned him 60 percent responsibility for his injury caused by a fall from a ladder while trimming trees outside defendant's convenience

store. Yacoub contends the trial court erred by refusing his proposed special jury instructions on the rebuttable and conclusive presumptions he was defendant's employee. Yacoub also contends the court erred when it reduced his damages and allowed testimony he had not received W-2 and 1099 forms. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Since 2006, defendant William Talia and his wife have operated the Bi-Rite Market located in downtown San Diego through their corporation, Josiey, Inc. Yacoub is married to Talia's cousin. Talia has employed family members at various times, including his brothers and cousin. Although Yacoub did not work at Bi-Rite Market on a regular basis, he occasionally performed odd jobs there, including washing and waxing the floors on two occasions in 2010 and trimming shrubbery on another occasion. In return, Talia paid Yacoub in cigarettes, lottery tickets, and between $50 and $100 in cash.

At trial, the parties provided contradictory accounts of how Yacoub came to trim the trees outside the Bi-Rite Market in July 2011. Yacoub testified he had a discussion with Talia several months prior to his injury about waxing the market's floors again. At the time, Talia did not want the floors waxed because customers were tracking fallen flowers from two large trees into the store. During June and July 2011, Yacoub and Talia discussed whether Yacoub should prune the trees to keep the flowers off the ground. Yacoub testified that Talia eventually asked him to prune the trees, but they did not set a price for the job. The lack of a predetermined price was not unusual because Yacoub completed work for Talia in the past without a predetermined price, and was paid whatever amount Talia desired on completion. At times this arrangement was not ideal

2

for Yacoub; on one occasion Yacoub was disappointed by the $59 Talia paid him for trimming weeds and bushes after he spent eight to 10 hours doing the job with the hope of receiving between $100 and $120.

On July 23, 2011, Yacoub arrived at the market to trim the two trees pursuant to Talia's request. He successfully trimmed the first tree, but was injured when he fell from the ladder while trimming the second tree.

At trial, Talia and his family provided a different version of events. Talia testified he never asked Yacoub to trim the trees and, in fact, Yacoub was not welcome at the store. Several weeks prior to Yacoub's fall, he and Talia had an argument, and Talia told him to leave the store and never return. However, although Talia's family testified that Yacoub was not welcome at the store, Talia's brother watched Yacoub trim the trees and helped him by picking up the trimmings from the sidewalk.

On September 21, 2011, Yacoub sued Talia and Josiey Inc., alleging he was an employee of Josiey, Inc., and stating causes of action for negligence, negligence per se - violation of California Code of Regulations, title 8, section 3276, negligence per se - violation of California Code of Regulations, title 8, section 1151, negligent infliction of emotional distress, and breach of statutory obligation to provide workers' compensation benefits.

The case proceeded to jury trial in September 2012. The jury found Yacoub was not an employee of Josiey, Inc., and was not acting within the scope of his employment when he fell. The jury found Talia was not negligent; found Josiey, Inc., was negligent and was a cause of harm to Yacoub; found Yacoub was also negligent; and found

3

Yacoub's negligence was a substantial factor in causing his harm. The jury assigned 60 percent of the responsibility for the harm to Yacoub and 40 percent responsibility to Josiey, Inc. The court also reduced the total damages Yacoub sought by the $16,878.60 "uninsured discount" the hospital applied to his medical bill.

Yacoub appeals, arguing the trial court erred when it (1) refused a proposed special jury instruction that a person in service to another is presumptively an employee, (2) refused a proposed special jury instruction that unlicensed tree trimmers are conclusively presumed to be employees, (3) reduced his damages award, and (4) improperly allowed introduction of evidence of his income taxes.

## DISCUSSION

### A. Jury Instructions

#### 1. *Standard of Review*

A party is entitled to have the jury instructed as to its theory of the case, provided that (1) it requests and submits legally correct instructions, and (2) there is sufficient evidence to support the theory. (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 547.) When a party argues that a jury has been erroneously instructed, we examine all the circumstances of the case. This includes a review of all of the evidence, as well as the instructions as a whole. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 72.) We review the court's alleged error in instructing the jury de novo. (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 164.) Whether a proposed jury instruction is legally correct is a question of law to which we apply our

4

independent review.  (See *Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24.)

   2.  *Rebuttable Presumption Instruction*

   Yacoub first argues the court erred when it refused to instruct the jury that "a person performing service for another is presumptively an employee."  However, the court did nor err because Yacoub's proposed special jury instruction was not legally accurate.

   Labor Code[1] section 3357 provides that "[a]ny person rendering service for another, other than as an independent contractor, . . . is presumed to be an employee."  However, Yacoub submitted the following proposed instruction to the court:  "In California, any person in service to another is presumptively an 'employee.' "  This proposed instruction does not accurately reflect the law because "any person in service to another" is not presumptively an employee--independent contractors are in service to another, but are not employees under section 3357.  This omission from the proposed instruction is significant because the statute's "express exclusion of 'independent contractors' is purposeful . . . and has a limited but important function" (*S. G. Borello & Sons, Inc. v. Dept. of Industrial Relations* (1989) 48 Cal.3d 341, 354) in determining when the "risk of 'no fault' work injuries [should be placed] directly on the provider, rather than the recipient, of a compensated service."  (*Ibid.*)  Because Yacoub's proposed

---

[1]    All statutory references are to the Labor Code unless otherwise specified.

instruction was not legally accurate, the trial court did not err in declining to submit it to the jury.

3. *Conclusive Presumption Instruction*

Yacoub contends he was entitled to a jury instruction that he was conclusively presumed to be defendant's employee under section 2750.5. That section deems a person an employee when he or she performs work for which a contractor's license is required, but the person does not have the required license. The applicable licensing statutes require a license for certain tree trimming work unless the aggregate value of the project is less than $500. If Yacoub was required to have a contractor's license to trim the trees outside the Bi-Rite Market--and is not exempt from the licensure requirement because of the $500 value exception to the license requirement--he is conclusively presumed to be defendant's employee. However, Yacoub presented no evidence of the value of the tree trimming work he performed prior to his fall, and there was evidence that suggested he would not have been paid more than $500. The court did not err when it found Yacoub had not provided sufficient basis to give the instruction.

Section 2750.5 establishes a "presumption affecting the burden of proof that a worker performing services for which a license is required [by Business and Professions Code section 7000 et seq.] . . . is an employee rather than an independent contractor." A worker who does not secure a required license is conclusively presumed to be an employee under this section. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 330-331.)

6

Further, Business and Professions Code section 7026.1, subdivision (a)(4), requires persons performing "tree pruning" to have a contractor's license except under certain circumstances that do not apply here. However, Business and Professions Code section 7048 provides that the licensing provisions of the Contractors' State License Law (Bus. & Prof. Code, §§ 7000 et seq.) do not apply "to any work or operation on one undertaking or project by one or more contracts, the aggregate contract price which for labor, materials, and all other items, is less than five hundred dollars ($500), that work or operations being considered of casual, minor, or inconsequential nature."

Yacoub contends section 2750.5 establishes that he was defendant's employee because the work he performed required a contractor's license, which he did not have. The trial court disagreed, finding first that there was a "failure of proof " and "no showing whatsoever that a license is at all required to do this work." The court also found, even had Yacoub shown he was required to have a license, he did not show the aggregate value of the work he performed was more than $500. To the contrary, the court found Yacoub had never been paid more than $500 for prior jobs he had performed for defendant. The court found section 2750.5 did not apply, and Yacoub was not entitled to his proposed jury instruction.

Without deciding whether a license is required to do the type of work Yacoub performed, we conclude the trial court did not err because a sufficient basis did not exist to give the conclusive presumption jury instruction in section 2750.5. Yacoub did not present evidence of the aggregate cost of the project, as the parties did not agree to a specific payment, and Yacoub did not purchase any materials to complete the project.

7

Moreover, no evidence in the record suggests Talia would have ever given Yacoub more than $500 for the tree trimming job.  To the contrary, Yacoub had performed work without a preset price in the past, and Talia paid him much less than $500 each time.  Because it appeared Yacoub was exempt from the licensure requirement, he was not entitled to the conclusive presumption that he was defendant's employee under section 2750.5.

Yacoub contends the exemption in Business and Professions Code section 7048 does not apply in this case because he operated without a contract with defendant.  As a result, it follows, that section is inapplicable because an "aggregate contract price" did not exist in the first place.  We are not persuaded.  Yacoub's position would require a class of persons whom the Legislature intended to exclude from the licensure requirement to have licenses.  However, the Legislature plainly intended to exclude persons who perform "work or operations being considered of casual, minor, or inconsequential nature" from having to obtain a contractor's license.  (Bus. & Prof. Code, § 7048.)  In doing so, the Legislature considered projects with total values of less than $500 as "casual, minor, or inconsequential."  (*Ibid.*)  This section's legislative history provides insight into the basis for exempting certain persons from the full licensure requirement:

> "There appears to be a common sense argument for exempting certain types of small projects that carry very minimal risk to the consumer from current law's requirements for full licensure by [the California State License Board].  For example, it seems to be completely reasonable for a homeowner to legally hire a 'handyman'--perhaps a retired neighbor, or a friend of a friend--to replace a section of wallboard in a garage, or to repair a leaky faucet."

(Sen. Com. on Business & Professions, Analysis of Sen. Bill No. 2217 (1997-1998 Reg. Sess.) April 27, 1998.)  At trial, the parties testified Yacoub essentially acted as a "handyman" who performed odd jobs for Talia on an infrequent and as-needed basis for sums never more than $500.  However, Yacoub asserts persons who casually perform odd jobs or favors for family members, neighbors, or friends would be required to be fully licensed by the California State License Board as contractors--even if they perform the work for free--simply because they did not enter into a formal contract.  We find no basis to sanction such an incongruous result.  The trial court did not err when it refused to give Yacoub's proposed special jury instruction on the conclusive presumption in section 2750.5.

B.  Reduction of Yacoub's Damages

The trial court reduced Yacoub's claimed damages by the $16,878.60 uninsured discount Scripps Mercy Hospital deducted from his medical services bill.  Invoking the "collateral source rule," Yacoub contends the court erred in doing so and also in precluding evidence or argument on the "reasonable value" of the costs he incurred.  However, the collateral source rule does not apply in this case.  Moreover, the trial court properly reduced Yacoub's damages because he was not liable for the amount by which the hospital discounted his bill, and, as a result, he did not suffer a detriment in that amount.

The collateral source rule provides that the damages awarded to an injured plaintiff cannot be reduced by the amount paid on the plaintiff's behalf by a source independent of the tortfeasor, such as an insurer.  (*Howell v. Hamilton Meats &*

9

*Provisions, Inc.* (2011) 52 Cal.4th 541, 551 (*Howell*); *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) "The rule thus dictates that an injured plaintiff may recover from the tortfeasor money an insurer has paid to medical providers on his or her behalf." (*Howell*, at p. 551.) "Examples of collateral sources that may not be used to decrease a plaintiff's recovery include medical insurance, pension and disability benefits, and continued wages paid by an employer." (*McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1222.) The plaintiff's insurance is wholly independent from, and collateral to, the tortfeasor, and the tortfeasor is not permitted to benefit from the plaintiff's prudence. (*Helfend*, at pp. 6, 10.)

Yacoub argues he "incurred" his medical expenses "when he received his bills." He further contends the distinguishing fact in *Howell* was the negotiation of the discount before the plaintiff sustained her injury. Thus, his logic follows, the costs the plaintiff in *Howell* incurred at the moment she received her bill reflected the prenegotiated discount with her insurance company. Here, Yacoub seems to contend that because his original bill did not reflect the discount, he incurred the medical costs in his original, undiscounted bill. Yacoub's theory fails for two fundamental reasons.

First, the collateral source rule is not applicable in this case. It is undisputed Yacoub was uninsured, and an insurance company did not pay any portion of his medical bill on his behalf. The record does not reveal that any other third party paid any portion

10

of the bill on his behalf.  Yacoub did not receive any compensation from a source independent of the defendant in this case.[2]

Second, Yacoub is incorrect that he incurred the full liability of the original medical bill at the moment he received it despite the hospital's later reduction of the bill. In *Howell*, the Supreme Court explained the following pertinent principles related to past medical damages:

> "California decisions have focused on 'reasonable value' in the context of *limiting* recovery to reasonable expenditures, not expanding recovery beyond the plaintiff's actual loss or liability.  To be recoverable, a medical expense must be both incurred *and* reasonable.  [Citations.]
>
> "The rule that a plaintiff's expenses, to be recoverable, must be both incurred *and* reasonable accords, as well, with our damages statutes. 'Damages must, in all cases, be reasonable . . . .' (Civ. Code, § 3359.)  But if the plaintiff negotiates a discount and thereby receives services for less than might reasonably be charged, the plaintiff has not suffered a pecuniary loss or other detriment in the greater amount and therefore cannot recover damages for that amount.  (*Id.*, §§ 3281, 3282.)"  (*Howell, supra,* 52 Cal.4th at p. 555.)

Whether Yacoub negotiated the uninsured discount himself, the timing of the discount and whether Yacoub received notice of the discount are irrelevant.  The critical factor is the amount for which Yacoub is liable because that amount represents the detriment he

---

[2]     Although Yacoub contends the uninsured discount is a "gift" the Supreme Court referenced in *Howell*, *supra*, 52 Cal.4th at p. 560, he is mistaken.  *Howell* stated:  "When an injured plaintiff has received collateral compensation or benefits as a gift, allowing a deduction from damages in that amount would result in a windfall for the tortfeasor and underpayment for the injury."  (*Ibid.*)  In this same paragraph, the Supreme Court cited a law review article that examined charitable gifts to victims in relation to tort compensation.  The uninsured discount Yacoub received is not a gift as denoted in *Howell*.

suffered. Here, he is not liable for the $16,878.60 deduction from his medical bill because neither he nor anyone else on his behalf was responsible for paying it, and he has therefore not suffered a detriment in this amount. To hold otherwise would allow Yacoub a windfall beyond his actual loss. (See *Howell, supra,* 52 Cal.4th at p. 555 ["[A] plaintiff may recover as economic damages *no more* than the reasonable value of the medical services received *and is not entitled to recover the reasonable value if his or her actual loss was less.*"] [second italics added], 559 fn. 6 ["[A] plaintiff who lacks health insurance would *not* be entitled to recover the reasonable value of the medical services if that amount exceeded the liability he or she incurred for the services. The rule that medical expenses, to be recoverable, must be both incurred *and* reasonable [citations] applies equally to those with and without medical insurance."]; see also *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1327, fn. 8 ["Damages for past medical expenses are limited to the amount that the medical providers accepted or agreed to accept as full payment."].) The court did not err when it adjusted Yacoub's damages.

C. The Tax Return Privilege

Yacoub contends the trial court erred when it "permitted evidence that taxes were never withheld for the work [he] performed . . . ." The introduction of this evidence, he contends, violated the "taxpayer privilege" and prevented him from receiving a fair trial. We conclude the trial court did not err because the tax return privilege does not apply under the circumstances of this case.

There is no recognized federal or state constitutional right to maintain the privacy of tax returns. (See *Couch v. United States* (1973) 409 U.S. 322, 336-337; *Deary v.*

12

*Superior Court* (2001) 87 Cal.App.4th 1072, 1075, fn. 2, 1077-1078.) However, California courts have interpreted state taxation statutes as creating a statutory privilege against disclosing tax returns. (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718-721; *Webb v. Standard Oil Co.* (1957) 49 Cal.2d 509, 513.) The purpose of the privilege is to encourage voluntary filing of tax returns and truthful reporting of income, and thus to facilitate tax collection. (*Webb*, at p. 513.) This limited privilege covers tax documents and the information contained in them. (*Schnabel*, at pp. 719-720; *Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 7.)

Here, defense counsel asked Yacoub on cross-examination whether he had ever signed a W-2 form or received a 1099 from Josiey, Inc., and Yacoub answered "no" to both questions. Moreover, Talia's wife, Linda, testified that a W-2 form had never been prepared for Yacoub, and he had never been on the company's employee payroll.[3] Finally, in closing argument, defense counsel argued: "The simple common sense, logical answer is if he wasn't hired, he wasn't an employee. And what is the evidence here? Never had a W-2, never had a 1099, was never on the [business's] work schedule." Yacoub argues this evidence of the nonexistence of 1099 and W-2 forms violated the

_____

[3] Although Talia argues Yacoub waived this issue when he did not object to Linda's testimony, the record reveals his counsel objected to defense counsel's cross-examination of Yacoub, the court overruled the objection, and the court allowed the line of questioning. Although counsel did not object to Linda's testimony, his objection had been overruled once, and further objection would have been futile given the court's prior ruling permitting Yacoub's testimony on the same matter. (See *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . ."].)

13

privilege against disclosure of tax return information.  However, Yacoub does not direct us to, and we have not found, any authority that supports his argument.  From our review of the authorities, it is evident the tax return privilege exists to prevent the affirmative disclosure of financial information that exists in a tax return, W-2, or similar documents.  Because Talia did not disclose any financial information, the tax return privilege does not apply here.[4]  The court did not err in allowing the testimony and argument regarding W-2 and 1099 forms.

## DISPOSITION

The judgment is affirmed.  Talia is entitled to costs on appeal.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

---

[4]    Yacoub also argues his tax return privilege was violated "because [the evidence] created the inference that (1) [he] was required to pay taxes on his income, and (2) [he] in fact did not pay taxes on the income."  However, *Webb* and its progeny protect only the disclosure of financial data, not, as Yacoub contends, the inference of payment or nonpayment of taxes.